John J. Sinko v. Commissioner.
Sinko v. Commissioner
Docket No. 4150-64.
United States Tax Court
T.C. Memo 1967-45; 1967 Tax Ct. Memo LEXIS 215; 26 T.C.M. (CCH) 232; T.C.M. (RIA) 67045; March 9, 1967
*215 Clinton B. Corry, for the petitioner. Hobart Richey, for the respondent. KERN Memorandum Findings of Fact and Opinion Respondent determined deficiencies and additions to tax in petitioner's income tax liability for the years 1959, 1960, and 1961 in the following amounts: Additions to Tax
Sec. 6653(b),
Year
Deficiency
1954 I.R.C.
1959
$6,489.87
$3,244.94
1960
1,517.14
758.57
1961
3,891.52
1,945.76
There was attached to the notice of deficiency an exhibit entitled "John J. Sinko Net Worth Computation," indicating that the deficiencies were predicated on increases in adjusted gross income resulting from computations of taxable income based upon the increases in the taxpayer's net worth plus nondeductible expenditures. In his petition, petitioner alleged that respondent erroneously determined the deficiencies by failing to take into account certain cash purchases of merchandise and that respondent understated petitioner's net worth as of December 31, 1958. Petitioner also alleged that respondent erred in not giving to petitioner a "bill of particulars" with regard to "on what basis and by what method [he] determined the *216 alleged deficiencies" and "in waiting for a period of over two (2) years after * * * examination and audit of petitioner's books and records before mailing * * * the notice of deficiencies." Respondent's answer, in addition to denying the allegations in the petition, affirmatively alleged those matters customary in cases in which respondent computes the tax liability of a taxpayer and additions thereto by the use of the increase in net worth plus nondeductible expenditures method, including an allegation that during the years at issue, "petitioner with intent to evade and defeat taxes failed to keep adequate books of accounts and records of his business and income-producing activities * * *." In all material respects respondent's affirmative allegations were denied in petitioner's reply. The issues presented for our decision are (1) whether respondent was justified in using the net worth plus non-deductible expenditures method of reconstructing petitioner's income in each of the years 1959 through 1961, (2) whether petitioner had unreported income in the years in question as computed by respondent by means of such net worth method and, if so, the amount thereof, and (3) whether *217 any part of the deficiencies for the years in question was due to fraud with the intent to evade tax. With regard to the itemized figures and entries set forth in the net worth statement and schedules attached to respondent's answer, the principal question presented for our decision concerns the amount of cash on hand at the beginning of the taxable years in question. No question has been raised with respect to the statute of limitations because timely waivers of the periods of limitation had been executed by the petitioner which extended the periods beyond the date of the mailing of the notice of deficiency. Findings of Fact Some of the facts have been stipulated by the parties. We find these facts to be as stipulated and incorporate herein by this reference the stipulation, together with the exhibits identified therein and attached thereto. Petitioner John J. Sinko resides in Richmond, Virginia, and filed his Federal income tax returns for the years in question with the district director of internal revenue at Richmond, Virginia. During these years petitioner operated a used furniture store, Jack's Used Furniture Mart. He also owned and operated a laundromat in Richmond *218 during 1958 and until the latter part of 1959 when he abandoned it as unprofitable. Petitioner carried on his used furniture business primarily with persons of low incomes to whom he sold on an installment basis without requiring any credit references. Petitioner's inventory was purchased by him from similarly situated people, many of whom were moving out of their homes and wanted to dispose of their furniture. Almost all of these inventory acquisitions were cash purchases since the people from whom petitioner bought the articles were disinclined to take checks in payment. Many of them were made by petitioner while he was out of his store making deliveries or collections. Occasionally a customer would suggest to petitioner that he visit a neighbor who had an article of furniture to sell. In order to facilitate this type of operation, petitioner normally carried a substantial amount of cash on his person, as much as $500 to $600. Before petitioner could resell most of the articles thus purchased, extensive cleaning and repairing of such articles were necessary. In the course of petitioner's business many of the customers to whom he had sold furniture on credit would default in their *219 payments, and it would become necessary for him to repossess it. During the taxable years petitioner made average annual repossessions of furniture originally sold by him for approximately $9,500. Of the furniture thus repossessed by him, over half was in such bad condition that it could not be resold. Petitioner continued to conduct this business until January 1965. At that time he had accounts receivable of $17,000. He sold these accounts receivable for $6,000 and his inventory for $2,500. Petitioner came to Richmond around 1950. At that time he rented a safe deposit box and continued to maintain a safe deposit box in that city through 1962. In May of that year his safe deposit box was opened in the presence of an agent of respondent and currency in the amount of $2,200 was found therein. A record of the Department of Health, Education, and Welfare of earnings credited to the old-age and survivors insurance account of John J. Sinko discloses that employers in various locations reported paying wages to petitioner in the total amount of $21,785.70 during forty-two of the seventy-two quarterly periods between January 1, 1937 and December 31, 1954, as follows: In the second quarter *220 of 1937 petitioner received wages from five different employers, three located in Harrisburg, Pennsylvania, one in Coatesville, Pennsylvania, and one in New York, New York. In the fourth quarter of that year he received wages from an employer in Harrisburg, Pennsylvania. This latter employer paid wages to petitioner during all of the quarters of 1938, 1939, 1940, and 1941. During the last quarter of 1941 he was also paid wages by another employer located in Harrisburg, Pennsylvania, and continued to be paid wages by that employer during the first two quarters of 1942. During the third quarter of 1942 he was paid wages by an employer located in Bridgeport, Connecticut, and by another located in New Harmony, Indiana. During the fourth quarter of that year he was paid wages by an employer located in New York, New York. During the first quarter of 1944 petitioner was paid wages by an employer located in Alexandria, Virginia, and by another employer located in Washington, D.C. During the second quarter of that year he continued to receive wages from the employer located in Alexandria. During the last quarter of 1944 he received wages from two employers located in Aberdeen, Maryland. *221 During the first and last quarters of 1945 and the first quarter of 1946 petitioner received wages from an employer located in Wilmington, Delaware. During the first, second, and fourth quarters of 1948 petitioner received wages from an employer located in Richmond, Virginia. In the fourth quarter of that year he also received wages from another employer in Richmond, and in the third and fourth quarters of 1949, the first and second quarters of 1951, and the second and third quarters of 1953, he received wages from the same employer. In the first two quarters of 1952 he received wages from an employer located in Boston, Massachusetts, and during the first three quarters of 1954 he received wages from an employer located in Petersburg, Virginia. The record of the Department of Health, Education, and Welfare relating to the earnings credited to the old-age and survivor's insurance account of petitioner does not disclose any earnings received by him from any employer during the first and third quarters of 1937, the entire year of 1943, the third quarter of 1944, the second and third quarters of 1945, the last three quarters of 1946, the entire year of 1947, the third quarter of 1948, *222 the first two quarters of 1949, the entire year of 1950, the last two quarters of 1951 and 1952, the first and last quarters of 1953, and the last quarter of 1954. Such record does disclose the crediting to this account of "Self-Employment Income" for the years and the amounts as follows: Year
Amount
1952
$ 489.92
1955
1,196.53
1956
1,875.37
1957
1,919.96
1958
1,497.82
1959
959.17
1961
839.65
Petitioner had no end-of-year inventory records for his furniture business. He had no records reflecting the totals of the accounts receivable, and he could not verify from his records of sales and repossessions the sales figures he reported on his income tax returns for the years in question. Petitioner had no records of rental income although he did report rental income during all three relevant years. The income tax returns of the petitioner for 1959, 1960, and 1961 were prepared by an accountant named Firth who was associated with a local accounting firm known as Perham & Co., Inc., during 1959. Firth did the work as an independent practitioner in 1960 and 1961. He prepared the returns from data furnished him by the petitioner, which included the laundromat *223 receipt book and totals of the various items from the furniture business. These totals were computed by the petitioner himself or under his direction by a woman who worked in his store. During the years here involved, petitioner failed to keep adequate books from which respondent could determine his correct taxable income. On June 26, 1962, during the audit of petitioner's tax returns for the years involved, an agent of respondent informed petitioner that his claimed cash disbursements for inventory were much higher than the receipts indicated. Petitioner told the agent that he felt some records were missing and requested some additional time to locate them. One or two days before July 27, 1962, respondent's agent received a telephone call from petitioner informing him that he had found additional receipts. On July 27, 1962, petitioner handed over to respondent's agent three rolls of paper which he claimed to have found in an old wardrobe. Although the pages were dirty, they were held together with bright, shiny staples. The rolls of paper were old pages from laundromat receipts books. The inventory purchases were noted on the backs of these pages, and there were adding machine *224 tapes of monthly purchase totals appended thereto. These inventory purchase lists, which contained only last names and dollar amounts, were characterized by an occasional repetition of groupings of names of purchasers. Respondent's agent had previously examined petitioner's laundromat receipts and had totaled them on an adding machine tape after which he returned the book to petitioner. Upon receiving these new inventory records, he compared his adding machine tape of the laundromat receipts book with the book which he had previously examined. He found that he had entries on his tape for which there were no receipts in the book as it then appeared. Upon examining the laundromat receipts, on the backs of which were the inventory purchase records turned over by petitioner on July 27, 1962, the agent was able to match these receipts with the receipts indicated on his adding machine tape but no longer found in the laundromat receipts books. Petitioner's inventory cash purchase records were prepared subsequent to the commencement of the audit and their belated preparation constituted an attempt to mislead respondent's agent with regard to the existence of proper records substantiating *225 cash disbursements for inventory. Respondent computed the petitioner's taxable income for the taxable years by means of the net worth plus non-deductible expenditures method as follows: NET WORTH STATEMENT
12/31/58
12/31/59
12/31/60
12/31/61
Assets: Cash on hand
$ 3,000.00
$ 1,000.00
$ 2,500.00
$ 2,500.00
Cash in banks
10,660.71
15,379.33
18,140.62
29,462.57
Accounts receivable
6,431.19
19,069.80
19,037.60
22,406.21
Merchandise inventory
1,100.00
1,500.00
1,000.00
1,400.00
Equipment and automobiles
4,300.00
6,860.00
8,265.00
4,480.71
Real estate
5,000.00
5,000.00
5,283.00
5,283.00
Total assets
$30,491.90
$48,809.13
$54,226.22
$65,532.49
Liabilities and Reserves: Notes payable
1,092.00
91.00
68.00
Reserve for depreciation - equip.
400.00
1,452.53
2,448.72
809.05
Reserve for depreciation - house
200.00
440.00
680.00
752.00
Total liabilities and reserves
$ 1,692.00
$ 1,983.53
$ 3,196.72
$ 1,561.05
Net worth end of year
$28,799.90
46,825.60
51,029.50
63,971.44
Net worth beginning of year
28,799.90
46,825.60
51,029.50
Increase in net worth
$18,025.70
$ 4,203.90
$12,941.94
Plus personal living expenses
2,108.97
2,877.89
1,386.67
Corrected adjusted gross income
$20,134.67
$ 7,081.79
$14,328.61
Less: Exemption
(600.00)
(600.00)
(600.00)
Standard deduction
(1,000.00)
(708.18)
(1,000.00)
Corrected taxable income
$18,534.67
$ 5,773.61
$12,728.61
*226 Respondent determined the following understatements in petitioner's income for the years 1959 through 1961: Net Worth
Petitioner's
Under-
Year
Method
Returns
statement
1959
$20,134.67
$1,821.23
$18,313.44
1960
7,081.79
(901.49)
7,983.28
1961
14,328.61
320.75
14,007.86
At trial respondent conceded error in his disallowance of depreciation in the amount of $9.57 in 1961 on an adding machine purchased by petitioner in that year. Petitioner's cash on hand as of December 31, 1958, December 31, 1959, December 31, 1960, and December 31, 1961, was $13,900, $7,500, $7,000, and $2,700, respectively. Petitioner's "accounts receivable" as of December 31, 1958, December 31, 1959, December 31, 1960, and December 31, 1961, were $8,208.99, $19,844.50, $19,812.30, and $22,406.21, respectively. With the exception of the depreciation item conceded by respondent and the asset items "cash on hand" and "accounts receivable" the various items and amounts set forth in respondent's "net worth statement," as set out above, have either been stipulated or have not been proved to be incorrect. Opinion KERN, Judge: Respondent has determined petitioner's income *227 by the net worth plus non-deductible expenditures method and has thereby determined deficiencies in taxable income as reported by petitioner on his tax return for the years 1959 through 1961. Although petitioner does not explicitly contest respondent's use of the net worth method of income reconstruction, one of his principal contentions on the pleadings, throughout the trial and on brief, is to the effect that respondent erred in disallowing petitioner's claimed cash expenditures for inventory in the years in question. This argument becomes irrelevant if we conclude, as we have concluded, that respondent properly used the net worth method in determining the deficiencies herein since only the net change in the inventory from one year to the next is considered in making computations of taxable income under such method. We have found that the books and records of petitioner were incomplete and inadequate. Our reasons for so finding appear in our Findings of Fact and need not be restated. Petitioner does not seriously contest this finding. In our opinion respondent was fully justified in using the net worth method in computing petitioner's taxable income. See Holland v. United States, 348 U.S. 121; *228 Frank Imburgia, 22 T.C. 1002; Morris Lipsitz, 21 T.C. 917, affd. 220 F. 2d 871. Accordingly, we consider petitioner's contention with regard to cash expenditures for inventory as being irrelevant and requiring no further discussion herein. Another contention of petitioner which is advanced by him with great vigor is to the effect that he had in his possession large amounts of currency in excess of the items referred to as "cash on hand" in respondent's net worth statement. This contention is, of course, extremely relevant to the issue of the correctness of respondent's computation of petitioner's taxable income under the net worth method. Petitioner's own testimony was to the effect that he had approximately $38,000 in currency when he came to the Richmond area around 1950, that he kept his currency in a safe deposit box in Richmond and occasionally removed large amounts thereof to Pennsylvania where it was entrusted to the custody of relatives, that the amounts thus removed were from time to time returned to Richmond, and that large sums of such currency were from time to time deposited in his various savings accounts. That petitioner *229 had considerable amounts of currency or "cash on hand" in his possession during the years in question is conceded by respondent in his net worth statement. This concession is consistent with the established facts that petitioner had a safe deposit box during those years and for many prior years and that when his box was opened in the presence of respondent's agent in May 1962, it was found to contain currency in the amount of $2,200. The question as to the amounts of such "cash on hand" as of the last of 1958, 1959, 1960, and 1961 has been difficult for us to resolve on the record before us. Because petitioner's testimony on this issue was selfserving and to some extent unclear and inconsistent, we are unable to accept it as proof sufficient to overcome the correctness of respondent's determination. However, to some extent it is corroborated by other evidence and facts established by the record. Petitioner's niece, a resident of Pennsylvania, testified that she saw him in her parents' house in Pennsylvania in the summer of 1958 with $25,000 in cash which she understood he was placing in the custody of her father. Petitioner testified that he withdrew this money from his brother "in *230 '58 or '59." As of December 31, 1958, a joint exhibit indicates that he had $10,000 in a savings account with a savings and loan association. Petitioner testified that this account was opened by the deposit of cash which he brought to Richmond from Pennsylvania. In February 1959, according to the testimony of petitioner's niece, which was detailed and circumstantial and not weakened on cross-examination, petitioner brought $13,500 in cash to her home in Pennsylvania on February 3, 1959, which he entrusted to her custody. Shortly thereafter she arranged by telephone with petitioner for a loan therefrom of $1,500 which she agreed to and did repay to him within 14 months. The remainder of the cash was returned to petitioner in November 1959. The joint exhibit above referred to indicates that as of December 31, 1959, the savings account, which was in the amount of $10,000 in 1958, had increased to $15,270.65. Petitioner testified that this increase was on account of a deposit of cash which he had brought back from Pennsylvania. In 1960, the year in which the loan to petitioner's niece was paid in full, petitioner opened two other savings accounts, and the net amount of the increase in *231 petitioner's savings accounts in that year was approximately $3,000. In May 1962, as we have said, petitioner had $2,200 in currency in his Richmond safe deposit box. In addition to his "cash hoard," petitioner made it a practice in the regular conduct of his business to carry on or about his person the sum of approximately $500 in currency. Doing the best we can with a record which is in many respects unsatisfactory, we have concluded [1] that the figures for "cash on hand" to be used in the net worth computations for December 31, 1958, December 31, 1959, December 31, 1960, and December 31, 1961, are those set out in our Findings of Fact. We have considered respondent's arguments based on several inconsistencies between petitioner's *232 testimony and that of his niece and between several parts of petitioner's own testimony. Many of these are with regard to matters of dates and are not of a type unusual in testimony given many years after the events. However, as we have indicated above, we have considered petitioner's testimony with regard to "cash on hand" as entitled to little weight except as corroborated by other testimony or by facts established by the record. We have also considered respondent's argument based on the failure of petitioner's brother to testify and the failure of petitioner to take and submit herein his deposition. That brother, Michael Sinko, lives in Pennsylvania, and is the person into whose custody petitioner claims to have given large amounts of cash. This case was set for trial on June 1, 1966, in Washington, D.C., after having been continued on petitioner's motion from the Richmond, Virginia calendar, where it was originally set for trial on March 22, 1966. On May 26, 1966, petitioner obtained subpoenas directing Michael Sinko and Vincent Dembroski (apparently the husband of petitioner's niece who later testified herein) to appear at the trial to testify on behalf of petitioner. When this *233 case was called for trial on June 1, 1966, the subpoena directed to Michael Sinko was returned to the Court showing service on May 29, 1966, and having attached thereto the following statement signed by Leo Ransavage, M.D., of Kingston, Pennsylvania: May 29, 1966 Mr. Michael Sinko, Sr. of 554 Plymouth Street, Breslau, Pennsylvania, is under my care and is not in any physical condition to appear in court on June 1, 1966. It will be at least more than ninety days before he can be present. The subpoena directed to Vincent Dembroski was served on the same day and was returned with the following statement of Peter J. Corey, M.D., of Wilkes-Barre, Pennsylvania, attached thereto: The above patient underwent major surgery by me on 18 May, 1966, and his present physical condition is such that he cannot appear in court, and is confined to his home as totally disabled until at or about 1 July, 1966. Thereupon petitioner's counsel orally moved for a continuance of the trial on the ground the testimony of these witnesses would be material on the question of the correct amounts of "cash on hand" of petitioner during certain of the years here involved. Respondent's counsel opposed the *234 granting of such motion and in the course of his opposition mentioned the possibility of holding the record open for the purpose of receiving the depositions of these witnesses. In a colloquy with counsel the judge commented on the general undesirability of depositions in fraud cases since in those cases it was particularly important for the judge to see the witnesses and observe their demeanor on the witness stand. After arguments were heard on the motion, the judge directed that counsel proceed with the trial and indicated that the record should be held open to some future date "for the testimony of these two witnesses at a time when they are able to be here." At the close of the hearing on June 1, 1966, at 5:00 p.m., the Court announced the recess of the trial to July 1, 1966, "for the sole purpose of hearing testimony in connection with the cash items in the net worth statement." On July 1, 1966, counsel for petitioner stated that the two witnesses above referred to were still too ill to testify, but that he would proceed with the trial of the case by the use of two other witnesses who were then present in Court, one of whom, Anna Dembroski, was the daughter of Michael Sinko and *235 (as we surmise from her having the same address and surname) the wife of Vincent Dembroski. [2] Thereupon the trial of this case was concluded without the formal request of either party for leave to take the deposition of Michael Sinko. Under these circumstances it is our opinion that the failure of Michael Sinko to testify herein, either in person or by deposition, should not give rise to an inference that Michael's testimony would have been materially unfavorable to the petitioner even though the absence of such testimony leaves some parts of petitioner's own testimony uncorroborated and to that extent weakened. Respondent in his argument that petitioner's "cash on hand" was not in excess of those amounts contained in his net worth statement also advances the contention that it would have been impossible for petitioner to have accumulated greatly in excess of those amounts during the years prior to and including 1958. This contention is based on the record of the Social Security Administration of the Department of Health, Education, and Welfare referred to in our findings which purports to *236 show that during forty-two of the seventy-two quarterly periods between January 1, 1937 and December 31, 1954, various employers of petitioner in various locations reported the payment to petitioner of earnings credited to his old-age and survivor's insurance account in the total sum of $21,785.70 and the crediting to his account during the years 1952, 1955, 1956, 1957, and 1958 of self-employment income in the total amount of $6,979.60. Respondent argues that this record "demonstrates" that petitioner's total "earnings" (which we assume he equates with "gross income") during the years 1937 through 1958 amounted to only $28,765 from which it would have been impossible for petitioner to accumulate a "cash hoard" greatly in excess of the figures used by respondent for "cash on hand" in the net worth statement. When this record of the Social Security Administration was offered in evidence by respondent as an exhibit herein, an objection thereto was sustained. Thereupon respondent moved us to reconsider our ruling on the objection, and this motion was taken under advisement and the exhibit was "lodged" with the Court. Our original ruling was made because of our view that this report *237 which reflected returns of earnings subject to social security contributions made by various employers of petitioner (only identified in the report by name and location) during forty-two of the seventy-two quarterly periods of the years 1937 through 1954 would not constitute proof in this proceeding that petitioner did not receive income during those years in amounts exceeding the "Earnings Credited to the Old-Age and Survivor's Insurance Account" of petitioner during this period and that it was therefore irrelevant and immaterial in this proceeding regardless of its impact pursuant to the provisions of 42 U.S.C.A. § 405 (c)(3) in proceedings involving petitioner's rights to benefits under the social security program or the procedures to be followed in establishing those rights. Upon reconsideration of the question of the admissibility of this report, we are of the opinion that the report is admissible because it contains a record of the amounts of self-employment income for certain years reported by petitioner himself and because its record of the transitory and peripatetic employment of petitioner during many of the years which it covers may be helpful and *238 relevant in the consideration of this case. However, we still adhere to the view that while this exhibit may constitute proof that petitioner did not receive earnings less than those set out therein for the quarterly periods covered, it does not constitute proof in this tax litigation that petitioner did not receive gross income during the years 1937 through 1954 in excess of the earnings and self-employment income set out therein. With regard to the alleged deficiencies in tax we have made another change in the figures used in respondent's net worth statement in addition to the change in the figures to be used as "cash on hand." That other change is in connection with the items representing "accounts receivable." Respondent's agent testified at some length concerning the method used by him in his "Reconstruction of Accounts Receivable," as set out on page A-2 of Exhibit 11, which resulted in the figures used in the net worth statement. In his computations pursuant to this method respondent's agent used figures representing monthly totals of sales in a "summary of sales" maintained by petitioner to which he posted monthly totals from "journals" purporting to contain the date and *239 amount of each sale. At the trial petitioner pointed out that the totals so used by respondent were erroneous in that the entries for three different months in the "summary" book were either the results of mistakes in the addition of items in the "journals" or of mistakenly taking a total from the wrong page of the "journals." These books were introduced in evidence early in the trial. An examination of such books discloses that in the three instances pointed out by petitioner the monthly figures used by respondent were erroneous; and consequently the annual totals were incorrect. We do not think that an oral stipulation by the parties with regard to the "accounts receivable" items arrived at much later in the trial, after a rather confused colloquy between the Court and counsel and without any consideration of or reference to the prior testimony of petitioner or the errors pointed out by him, should preclude the use of correct figures in place of the three figures which are obviously incorrect. As the Court said in H. B. Zachry Company v. United States, 344 F. 2d 352, p. 357, "A Court may relieve a party of his stipulation if necessary to prevent an injustice, particularly *240 where facts contrary to the stipulation are established by the evidence." [Emphasis supplied.] See also, William Ernest Seatree, 25 B.T.A. 396, 401; Bare v. Parker, 51 Cal. App. 106, 196 P. 280. Using the same method of calculation as that used by respondent's agent but with the correct figures for the three months above referred to in place of the incorrect figures, we have arrived at the amounts set out in our findings which should be used as "accounts receivable" in the computation of petitioner's taxable income under the net worth method. Even with the adjustments in respondent's net worth statement above referred to, it is apparent that computations under Rule 50 pursuant to the net worth method (the use of which in this case we have approved) will result in deficiencies against petitioner for each of the three years here involved. With regard to the deficiencies in petitioner's tax liability the petitioner has the burden of proving error in respondent's determinations; but with regard to the additions to tax pursuant to section 6653(b), I.R.C. 1954, the respondent, as he himself concedes, has the burden of proving the alleged *241 fraud by clear and convincing evidence. In connection with the fraud issue respondent argues that the consistent understatement of income by petitioner for the three years here involved, as compared with the income disclosed by the use of the net worth method, provides evidence of a fraudulent intent. As we have said, petitioner has the burden of proving that respondent erred in his determination of deficiencies in tax. In making such determination respondent properly used the net worth method. Accordingly, petitioner had the burden of proving that the various items used by respondent in his net worth statement were erroneous. In view of this burden of proof, we have concluded that petitioner's uncorroborated, self-serving, and frequently inconsistent testimony is not sufficient to warrant a finding that the items for "cash on hand" in such statement were in excess of the amounts set forth in our findings, which amounts were based only on such testimony of petitioner which was corroborated by other credible testimony and facts established by the record. However, upon the fraud issue respondent has the burden of proof, and when he relies upon repeated understatements of taxable *242 income as evidence of fraud and when he undertakes to demonstrate such understatements by use of the net worth method, he has the burden of proving the accuracy of all of the items used in his net worth statement, including the items "cash on hand." We cannot assume that they are accurate merely because the petitioner has failed to prove that they are erroneous. See Denny York, 24 T.C. 742; Sideny Cohen, 27 T.C. 221. In our opinion respondent has not proved by clear and convincing evidence that petitioner did not have "cash on hand" considerably in excess of the amounts which, in our opinion, petitioner proved that he had. In this case, unlike many cases involving alleged "cash hoards," the fact that petitioner had large amounts of "cash on hand" is not disputed. In 1962, even after the considerable annual increases in petitioner's savings accounts during 1958, 1959, 1960, and 1961, respondent's agent found currency in the amount of $2,200 in the safe deposit box which had been maintained by petitioner since 1950. Petitioner testified that when he came to Richmond and commenced business there, he had over $37,000 in cash. He explained to respondent's agent, *243 with a reluctance which does not seem to us unnatural, that he had acquired this cash by operating a "speakeasy" and transporting whiskey in the 1920's, by operating a gambling establishment in Pennsylvania, by operating "a game of chance with a traveling carnival," and by a real estate transaction. Respondent's agents made no attempt to check on these various explanations (see Holland v United States, supra at 135), since they considered them to be vague and inconsistent one with the other and inconsistent with other statements of petitioner. We do not consider that these putative sources of cash are inconsistent with each other. Also, they did not appear to us as inconsistent with the impression of petitioner's character and personality which we gained from his testimony and demeanor on the witness stand. Nor were these statements inconsistent with the exhibit offered in evidence by respondent, to which we have already referred, containing records of earnings and income reported to the Social Security Administration for certain of the quarterly periods during the years 1937 through 1961, and which contains no record of any employment of petitioner during thirty-two of *244 such quarterly periods and, of course, of any employment prior to 1937. Aside from this exhibit, no testimony was adduced by either party with reference to petitioner's employment or income during years prior to the three taxable years. Upon the record before us, it is our opinion that respondent has failed to prove by clear and convincing evidence that there was a consistent pattern of substantial understatement of taxable income by petitioner during the years in question. Even if respondent had borne his burden of proof with regard to all of the items used by him in his net worth statement in computing petitioner's taxable income for the years here in question and had thus established understatements of petitioner's taxes for these three years, such understatements standing alone would not warrant a conclusion that petitioner's understatements of tax for these years were due to fraud and accordingly were subject to the 50 percent additions to tax provided by section 6653(b), I.R.C. 1954. As we said in John Marinzulich, 31 T.C. 487, p. 490: Repeated understatements of income, of course, are evidence from which fraud may be inferred, Nathan Bilsky, 31 T.C. 35, *245 but there must be something more in order to meet the "clear and convincing" test, especially in those cases where, as here, the understatements appear by comparing the income returned with income computed by the net worth method. [Emphasis supplied.] Respondent's principal argument that there is "something more" in this case is based upon the fact that petitioner prepared certain cash purchase "records" after the commencement of the audit by respondent's agent in an attempt to mislead the agent with regard to the existence of proper records substantiating cash disbursements for inventory. We consider this action, even though taken under the pressure of an internal revenue audit, to be reprehensible and to adversely reflect upon the general credibility of petitioner. However, there is no evidence that these "manufactured" records were essentially false and no specific evidence showing that the figures representing cash disbursements for inventory used in petitioner's income tax returns were false and fraudulent. In our opinion the preparation of these records of cash purchases for inventory made during an audit subsequent to the taxable years for the purpose of misleading the *246 agent with regard to their existence during the taxable years was not proof that any part of any understatement of tax required to be shown on petitioner's returns for the taxable years was due to fraud. Accordingly, we do not think that it can constitute the "something more" referred to in John Marinzulich, supra. We conclude that respondent has failed to prove by clear and convincing evidence the fraud prerequisite to the additions to tax authorized by section 6653(b), I.R.C. 1954. Decision will be entered under Rule 50. Footnotes
1. In reaching these conclusions we emphatically note that we have not relied in any way on the testimony of petitioner's witness, Margie Merkel. Her demeanor on the witness stand, the inconsistencies and incoherence in her testimony before us, and the inconsistencies between some of that testimony and prior statements made to respondent's agents convince us that her testimony is worthless. We agree with respondent that it should be disregarded.↩
2. The other witness was the Margie Merkel referred to in footnote No. 1, supra.↩