## JOHN AND MARY MARINZULICH, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 64892.   Filed November 28, 1958.

*Henry Hammer, Esq.*, for the petitioners.
*Raymond Whiteaker, Esq.*, for the respondent.

MULRONEY, *Judge:* Respondent determined deficiencies in income tax and additions thereto for the petitioners as follows:

| Year | Income tax | Additions to tax Sec. 293 (b) | Year | Income tax | Additions to tax Sec. 293 (b) |
|---|---|---|---|---|---|
| 1942 | $4,756.65 | $2,378.33 | 1947 | $11,591.81 | $5,795.91 |
| 1943 | [1]1,712.72 | 856.36 | 1948 | 6,270.02 | 3,135.01 |
| 1944 | 1,238.21 | 619.11 | 1949 | 6,455.58 | 3,227.79 |
| 1945 | 7,269.69 | 3,634.85 | 1952 | 253.44 | 126.72 |
| 1946 | 28,085.20 | 14,042.60 | | | |

[1] And Victory tax.

The issue is whether petitioners filed false and fraudulent income tax returns for any of the years involved with intent to evade taxes.

### FINDINGS OF FACT.

Some of the facts were stipulated and are found accordingly.

John and Mary Marinzulich are husband and wife who live in Tampa, Florida. John Marinzulich, hereinafter sometimes referred to as petitioner, filed his individual income tax return for the year 1942, and John and Mary Marinzulich filed their joint income tax returns for the years 1943 to 1952, inclusive, with the then collector of internal revenue for the district of Florida at Jacksonville, Florida.

Petitioner, who was 63 years old at the time of trial, was born in Austria. He finished the third grade in school, which was the extent of his formal education. He came to this country in 1907 and stayed here for 6 years and then returned to Austria. While in Austria he was drafted for service in the Austrian army and, thereafter, he returned to this country in 1921 and went to work on a towboat for the New York Central Railroad. After about 2 years he went to Freeport, New York, where he worked as a fisherman. He stayed in Freeport until about 1934 or 1935 when he went to Port Royal, South Carolina, and engaged in the shrimping business. At first he had

one boat and later, when his sons began to help him, he got another boat, and later on a third boat so that by the beginning of World War II he was operating three boats, all engaged in his business of catching shrimp which he sold mostly to the New York markets. These boats were requisitioned by the United States Government at the outbreak of World War II and petitioner spent about 2 years working on the dock and packing shrimp for others. After about 2 years two of the boats were turned back to petitioner; the third boat had been lost during the war. Petitioner built two or three more boats so that around 1946 he had four or five boats operating in his shrimping business.

During the years involved petitioner carried on his shrimping business in Beaufort, South Carolina, in the summer and in St. Augustine, Florida, in the winter. He lived at both places and maintained bank accounts in banks at both cities.

Petitioner can read and write but he had no training in bookkeeping and he was unfamiliar with tax matters. He kept a simple record of receipts and expenditures in a notebook and checking and savings accounts in banks at Beaufort, South Carolina, and St. Augustine, Florida. There was also a savings account in a bank at Freeport which was closed out in 1950. The notebook method of recording receipts and expenditures was maintained for the years 1942 to 1947. When his sons returned to the business after World War II, a double entry set of books was kept by one of the sons for the years 1948 to 1952. The books for the years 1943 to 1947 were not found but the single entry notebook for either all or a part of the year 1942 was found. This book, together with all of the double entry books for the years 1948 to 1952, and the bank statements, canceled checks and check stubs were turned over to the revenue agents in three or four large boxes when they started their investigation in June of 1954.

Petitioner's income tax returns for all of the years in question were prepared by A. S. Russell, of St. Augustine, Florida, and they were all prepared from information furnished Russell by petitioner. Petitioner paid Russell from $100 to $300 each year for his services. Russell has been in the accounting business for about 38 years and he prepares about 500 Federal income tax returns a year.

In 1942 petitioner's boats, the *Princess Mary* and *Lady Mary* were requisitioned by the United States Government and sold to the War Shipping Administration. Respondent computed the gains on these sales to be $3,303.33 and $1,496.33, respectively. In 1944 petitioner sold a boat named *Baby Mary* and respondent computed the gain on this sale to be $1,360.41. Petitioner admitted the correctness of these computations.

During the years involved John Marinzulich had interest income on savings accounts in the following amounts:

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1942 | $43. 37 | 1947 | $159. 86 |
| 1943 | 57. 38 | 1948 | 223. 03 |
| 1944 | 56. 82 | 1949 | 327. 94 |
| 1945 | 200. 11 | 1952 | 292. 46 |
| 1946 | 183. 74 | | |

On their Federal income tax returns for each of the taxable years 1942 to 1949, inclusive, and 1952, the petitioners reported net taxable income as follows:

| Year | Net income per return | Year | Net income per return |
|------|-----------------------|------|-----------------------|
| 1942 | $3, 164. 60 | 1947 | ($14, 868. 89) |
| 1943 | 4, 435. 46 | 1948 | 6, 227. 55 |
| 1944 | 2, 312. 88 | 1949 | 4, 340. 66 |
| 1945 | 5, 644. 31 | 1952 | (15, 432. 30) |
| 1946 | 20, 345. 72 | | |

The net worth schedule upon which respondent's determination of income was based discloses variations of income as between the net worth statement and income tax returns as filed as follows:

| Year | Amount of understatement | Year | Amount of understatement |
|------|--------------------------|------|--------------------------|
| 1942 | $14,013.48 | 1947 | $44,658.51 |
| 1943 | 5,525.55 | 1948 | 22,114.50 |
| 1944 | 4,556.81 | 1949 | 23,392.60 |
| 1945 | 16,298.96 | 1952 | 17,762.83 |
| 1946 | 43,419.15 | | |

No part of the deficiencies for the years 1942 to 1949, inclusive, and 1952 is due to fraud with intent to evade tax.

### OPINION.

Respondent, through the use of the net worth plus personal expenditures method, computed the petitioner's net income for the years 1942 through 1952. Such computation showed amounts of net income in each of the years except 1950 and 1951 in excess of the amounts reported by the petitioners in their income tax returns for those years. In each of the years 1950 and 1951 the petitioners reported a net loss and the respondent in his net worth computation merely reduced the amount of the net loss for each of the years. Respondent, in addition to the deficiencies determined by him for the years 1942 through 1949, and for the year 1952, determined that the petitioners were liable for additions to tax under section 293 (b) of the Internal Revenue Code of 1939. Respondent concedes that all of the years are barred by the statute of limitations unless the returns were false or fraudulent with intent to evade tax. Sec. 276 (a), I. R. C. 1939.

The burden of proof to show fraud is on the respondent and it must be established by clear and convincing evidence. *Arlette Coat Co.*, 14 T. C. 751. In *William W. Kellett*, 5 T. C. 608, 616, we said:

What constitutes fraud is a question of fact which frequently requires a nicely balanced judgment to answer. To be considered are all of the facts and circumstances surrounding the conduct of the taxpayer's business and all the facts incident to the preparation of the alleged fraudulent return. *The conclusion must be reached not on isolated bits of testimony, but on the whole record.* * * * [Emphasis added.]

Respondent emphasizes the consistent understatements of income by the petitioners on their income tax returns. It is not enough, however, to establish fraud merely by showing understatements of income. *Holland* v. *United States*, 348 U. S. 121; *Blackwell* v. *United States*, 244 F. 2d 423; *James Nicholson*, 32 B. T. A. 977, 989, affd. 90 F. 2d 978. Repeated understatements of income, of course, are evidence from which fraud may be inferred, *Nathan Bilsky*, 31 T. C. 35, but there must be something more in order to meet the "clear and convincing" test, especially in those cases where, as here, the understatements appear by comparing the income returned with income computed by the net worth method.

Respondent argues that the petitioner's failure to maintain proper books and records for the years 1943 to 1947 is evidence of fraud. From all of the evidence, including that of the respondent's witness, Russell, we gather that a single entry book was kept during those years by the petitioner and was made available to the accountant each year. It was petitioner's testimony that Russell, the accountant who prepared petitioner's returns, advised him to keep the books in this single entry. Russell testified that he could not remember giving petitioner this advice but neither would he deny it and he further said he was not "critical" of the records furnished to him and he "presumed them to be O. K." Keeping in mind the petitioner's limited educational background, as well as the well-known scarcity in those years of competent clerical help, we cannot say that the petitioner's failure to maintain proper books and records for the years 1943 to 1947 was indicative of fraud. It is clear that evidence of inefficiency and ignorance of accounting methods are not sufficient to establish fraud. *Walter M. Ferguson, Jr.*, 14 T. C. 846; *W. F. Shawver Co.*, 20 B. T. A. 723.

Respondent also seeks to establish fraud by showing that the petitioner failed to report certain rental income, bank interest, and gains from the sales of boats. We have made no finding of fact with respect to the rent receipts. The evidence with respect to such receipts consists of no more than a few lines in the record. It is scant and unsatisfactory and it merely discloses that at some time during the period

of years here involved the petitioner owned in St. Augustine, Florida, a building variously described as a machine shop or fishhouse, and that at some undisclosed period of time it was "rented out" under some loose arrangement involving work exchange with some person at a rental of around $40 or $50 a month. Petitioner testified that this was disclosed to Russell and that the latter was aware of it since he carried the insurance on the building. The evidence concerning the boat sales is the agent's testimony that his investigation disclosed certain dates when the boats were acquired, the cost basis of the boats, and the amounts paid in 1942 by the War Shipping Administration for two of them, the *Lady Mary* and the *Princess Mary*. The agent also testified that a third boat, the *Baby Mary*, was sold in 1944 to a third party and he gave his computation of gain on the sale. Petitioner testified that he told Russell all about these boat sales and this testimony is verified by the fact that the names of the boats are on the accountant's work papers that were placed in evidence. The accountant made no denial that he knew of the boat sales. As for the bank interest, the petitioner testified that he did not know that such interest had to be reported when it was merely credited to his bank account. Again, he relied on Russell, and the latter, testifying for the respondent, was not asked if he knew of such interest income.

We must view the evidence, such as it is, of the omissions of specific income items together with the whole record. *William W. Kellett, supra.* Petitioner was poorly educated and he was totally unfamiliar with the income tax statutes. His work day was long and arduous, usually starting at 3 or 4 in the morning, and it consisted of working with boats, nets, engines, and rigging. His sons were in service during some of these years. Petitioner testified that during this time the paper work was the "worst job for me to do" and when his sons returned from the service he was only too glad to turn over the bookkeeping to them. His business grew during this period, and it is obvious that he was quite pressed to cope with the surge in the shrimp business. We think that our remarks in *E. S. Iley,* 19 T. C. 631, 635, are particularly appropriate here:

Fraud is never to be presumed. It must be proved by clear and convincing evidence. Moreover, the burden of proving fraud rests on the Government. Addressing ourselves to the facts established, we find abysmal ignorance on the part of the party charged with keeping petitioners' accounts; the business had grown from small beginnings to large proportions, but the capacity of the member of the firm keeping the books did not grow in proportion. He was a farm boy, with a high school education, who had neither training nor experience in keeping proper books. There is ample proof of inaccuracies in the books, most of them to the benefit of petitioners, some, however, of benefit to the Government. Although the bookkeeping was inadequate by any standard, there is no evidence of intentional concealment or deliberate misrepresentation. The errors were patent to any one versed in accountancy. The petitioners were guilty of poor

judgment in not having the books audited but poor judgment and ignorance are not tantamount to fraud. There is lacking one essential element, the very heart of the fraud issue, namely, the intent to defraud the Government by calculated tax evasion.

Although intent is a state of mind, it is nonetheless a fact to be proven by the evidence. It must appear as a positive factor. In determining the presence or absence of fraud the trier of the facts must consider the native equipment and the training and experience of the party charged. The whole record is to be searched for evidence of the intent to defraud. In this case, we have studied the record with the extra care such a case deserves; we have noted the demeanor of the witnesses on the stand; we have tested petitioners' conduct by approved standards of ascertainment and have come to the conclusion that petitioners were not motivated by an intent to defraud. * * *

Petitioner testified that he took everything to Russell, who admittedly held himself out as an expert on the preparation of income tax returns; that he relied entirely on Russell to prepare the returns and that he could not understand them after they were prepared. Russell also testified that the petitioner turned over his books, checkbooks, and other papers to him. There is no indication in the record that petitioner failed to turn over any records to Russell and we are satisfied that Russell had complete access to all the information bearing on the petitioner's income tax liability. Russell prepared worksheets from the petitioner's books and checkbooks for the computation of the yearly tax liability. These worksheets, which appear to be breakdowns in considerable detail, were introduced in evidence and Russell, apart from identifying them as respondent's witness, failed to explain any of the data appearing on them. We think that the petitioner was justified in relying upon Russell to prepare the returns correctly. There are strong indications in the record that Russell failed to utilize all the information in his possession. This was somewhat evident to us from Russell's demeanor on the stand and his evasiveness in answering some of the questions. We do not think that, under these circumstances, the fraud of the petitioner is shown by the necessary quantum of proof. *Davis* v. *Commissioner*, 184 F. 2d 86.

The revenue agent admitted that the petitioner fully cooperated with him in the investigation covering these years and that all of the assets found by the agent were either in the books or bank accounts supplied by the petitioner, or were disclosed by the petitioner to the agent. There is no evidence of falsification of records or of any design on the part of the petitioner to mislead the agent. It is true that the revenue agent testified some of the bank statements and canceled checks, as well as some of the check stubs, for some of the years, were missing, but it also appears in the record that some boxes of old records had been destroyed by wharf rats in petitioner's fishhouse.

It should be pointed out that the petitioner was faced with difficulties in reconstructing his true income of the years involved because

some of the necessary records were either unavailable or were in no condition to be properly studied. This unavailability, we might add, was not due to any deliberate conduct on the part of the petitioner. Also, it appears that a portion of the understatement of net income for the years 1946 and 1948 is due to the disallowance by the respondent of certain bonus payments made by petitioner to his sons in those years in the amounts of $7,000 and $4,000, respectively. This disallowance contributes materially to the size of the purported understatements of net income for those years. We need not decide whether such disallowances were proper, but it is sufficient here merely to point out that the petitioner quite conceivably and in good faith could have thought that such bonus payments were properly deductible. It also appears that petitioner's shrimp boats were requisitioned during the war by the Government and that subsequently they were returned. Such transactions could easily be confusing in their tax aspects to a person with no more education than petitioner.

We have examined the record carefully and are persuaded that the evidence is not sufficient to establish fraud. It might establish suspicion of fraud but "[m]ere suspicion of fraud and mere doubts as to the intentions of the taxpayer are not sufficient proof of fraud." *L. Glenn Switzer*, 20 T. C. 759, 765. We hold that the years here involved are barred by the statute of limitations.

*Decision will be entered for the petitioners.*