Camden Wall Paper Company v. Commissioner. Samuel Schultz and Ada Schultz v. Commissioner.
Camden Wall Paper Co. v. Commissioner
Docket Nos. 446-65, 447-65.
United States Tax Court
T.C. Memo 1967-52; 1967 Tax Ct. Memo LEXIS 209; 26 T.C.M. (CCH) 254; T.C.M. (RIA) 67052; March 20, 1967
*209 1. Held, respondent failed to prove that petitioners (corporate and individual) were guilty of fraud with intent to evade tax for the taxable years here in question. 2. Held, the statute of limitations bars the assessments of deficiencies against the petitioners for the taxable years 1953 through 1955. Marvin Comisky, Elliott K. Braverman, and Edwin E. Easton, 11th Floor, Four Penn Center Plaza, Philadelphia, Pa., for the petitioners. Dennis C. DeBerry, for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion ARUNDELL, Judge: In these consolidated proceedings respondent determined deficiencies in income tax and 50 percent additions to tax pursuant to section 293(b), I.R.C. 1939, and section 6653(b), I.R.C. 1954, as follows: Camden Wall Paper Company
50% Additions to Tax
Fiscal
Year
Defi-
Sec. 293(b)
Sec. 6653(b)
Ended
ciency
I.R.C. 1939
I.R.C. 1954
11-30-53
$1,297.50
$ 648.75
0
11-30-54
1,497.00
0
$ 748.50
11-30-55
1,197.00
0
748.50
11-30-56
0
0
1,811.42
11-30-57
0
0
1,771.29
11-30-58
0
0
1,445.89
Samuel and Ada Schultz
1953
$2,120.20
$1,060.10
0
1954
1,664.64
0
$ 832.32
1955
1,672.26
0
836.13
1956
0
0
1,527.34
1957
0
0
2,045.62
1958
0
0
1,797.20
1959
0
0
1,718.63
*210 The only issues involved are: (1) whether petitioners are liable for the 50 percent additions to tax for all years, and (2) whether the statute of limitations bars the assessments of the deficiencies determined for the taxable years 1953 through 1955. Petitioners omitted certain income for all years. Petitioners concede the correctness of the omitted income but contend that it was inadvertently omitted, with no intention to defraud the Government. Petitioners have paid the deficiencies for all the open years and offered to pay the deficiencies for the barred years provided the respondent waived the 50 percent addition. This the respondent refused to do. Findings of Fact Camden Wall Paper Company, sometimes referred to herein as Camden and sometimes as the corporate petitioner, was and still is a corporation organized under the laws of New Jersey in 1923. It filed its corporate income tax returns (Form 1120) for the fiscal years ended November 30, 1953, through November 30, 1958, with the then district director of internal revenue at Camden, N.J. It kept its books and records on an accrual basis of accounting and on a fiscal year ending November 30th. Camden was at all times *211 here involved engaged in the business of selling wallpaper, paints, and paint products at its principal place of business located at 32 Haddon Avenue, Camden, N.J. Samuel and Ada Schultz, sometimes referred to herein as the individual petitioners or by their given names, are individuals, husband and wife, residing at Cedarbrook Hill Apartments, Wyncote, Pa. They filed their joint Federal income tax returns for the calendar years 1953 through 1959 on a cash basis of accounting with the district director of internal revenue, Philadelphia, Pa.
Throughout the period here involved, all of the outstanding stock of Camden was owned by Samuel and Ada. Samuel was the salaried president-treasurer of Camden and Ada was the salaried secretary during the taxable years. Each of Camden's tax returns filed for the taxable years 1953 through 1958 was signed by Samuel as president and by Herman N. Greenberg as the person preparing the return. Greenberg also signed all of the joint returns, as the person preparing the returns, except the return for 1954, but in that return Greenberg was named as the person who was paid for assistance in the preparation of the return. Greenberg, a certified public *212 accountant, has continuously been in charge of the accounting work for all the petitioners since sometime in 1939. During the taxable years ending November 30, 1953, through November 30, 1958, Camden owned a parking lot located at the corner of Carman Street and Haddon Avenue in Camden, N.J., which lot was next to the building in which Camden conducted its wallpaper and paint business. The lot and building had been acquired by Camden about 1949. At that time Greenberg asked Samuel if the parking lot was going to be operated as an adjunct to the wallpaper and paint business and Samuel replied that he was turning the lot over to his brother-in-law, Jack Atkins, rent-free. Atkins fell dead on the parking lot some time in 1952. Greenberg did not know that Atkins had died until he was apprised of that fact by one of the revenue agents in 1959. Until that time, Greenberg was under the impression that there was no income being derived from the parking lot. After Atkins died, his widow operated the lot for about 6 months. Under date of November 18, 1952, Rudolph H. Rosenfeld, a real estate broker, drew up a lease between "Camden Wall Paper Co." as lessor, and "Robert Brandt" as lessee, *213 wherein the said parking lot in question was leased to Brandt for a term of 2 years from January 1, 1953, at a rental of $350 per month. On the same date Rosenfeld addressed a letter to Samuel, the first two paragraphs of which were as follows: Enclosed herewith please find lease in triplicate covering the rental of the parking lot at Haddon Avenue and Carman Street, Camden, N.J., together with a check for the first month's rent less my commission, for the rental from January 1st in advance. Will you please have all three copies signed by the proper officers for Camden Wall Paper Co., have the seal affixed and return two copies to me. When the two copies of the above-mentioned lease were returned to Rosenfeld, "Camden Wall Paper Co." as lessor had been stricken and "Samuel Schultz" insertedas lessor; and Samuel, instead of signing the lease as president of Camden, signed it in his individual capacity. The enclosed check was also dated November 18, 1952, was made payable to the order of "Camden Wall Paper Co." in the amount of $332.50 ( $350 less a commission of 5 percent), and was endorsed "Camden Wall Paper Co. Samuel Schultz." On November 17, 1954, Rosenfeld drew up a new *214 lease on the same property at the same rental between Samuel as lessor and Brandt as lessee for a term of 3 years; and on December 31, 1956, a 5-year lease was executed between the same parties, on the same property at the same rental of $350 per month, less a 5 percent commission to Rosenfeld. All three leases contained this provision: 3-A. It is specifically understood and agreed between the parties hereto that the Lessee will at all times arrange for parking for the Lessor's customers. The Lessor agrees to pay the Lessee the sum of ten cents for the first hour of any parking of the Lessor's customers' cars after which an additional charge will be made by the Lessee on the basis of the current rate charged by Lessee for other parking on these premises. Camden paid Brandt for the parking of Camden's customers an average of from $40 to $60 per month. All subsequent monthly checks from February 16, 1953, to May 7, 1959, inclusive (76 checks), were made payable to Samuel and were signed by "R. H. Rosenfeld, Tillie R. Saggese, Atty-in-Fact, Trustee account." The checks all had a notation thereon that the check was in full payment of the rent for the Brandt's parking lot. The checks *215 were all deposited in the bank accounts of the individual petitioners except about three of the 76, which were cashed by Samuel while on vacation. The remaining seven checks for 1959, beginning with the check dated June 4, 1959, were all made payable to "Camden Wall Paper Co." No income for rent of the said parking lot was entered on Camden's books and records for any of the years here involved. No income for rent of the said parking lot was reported in Camden's corporate income tax returns for the taxable years here involved. Camden, however, reported rents from sources other than the parking lot and a total gross income from all sources as follows: Fiscal Year
Total Gross
Ending Nov. 30
Rents
Income
1953
$ 7,125.00
$ 73,716.37
1954
5,880.00
77,140.68
1955
6,435.00
78,335.61
1956
5,362.50
96,807.11
1957
4,245.31
90,538.70
1958
4,245.34
87,025.33
Totals
$33,293.15
$503,563.80
The omitted rental income by Camden from the parking lot was in amounts as follows: Fiscal Year
Omitted Income
Ending Nov. 30
From Parking Lot
1953
$ 3,325 (10 months)
1954
3,990
1955
3,990
1956
3,990
1957
3,990
1958
3,990
Total
$23,275
*216 The individual petitioners received from Rosenfeld checks for rent from the said parking lot during the calendar years 1953 through 1959 the following amounts: Calendar
Amounts
Year
Received
1953
$ 3,657.50 (11 months)
1954
3,990.00
1955
3,990.00
1956
3,990.00
1957
3,990.00
1958
3,990.00
1959
1,662.50 (5 months)
Total
$25,270.00
No part of the $25,270 was reported by the individual petitioners in their joint income tax returns. The respondent determined [1] that the above amounts first constituted corporate rental income to Camden and, second, "Informal Dividends" to the individual petitioners, less the dividend exclusion of $100 where applicable. On October 15, 1954, the individual petitioners opened a savings account, No. D75,555, with the Philadelphia Saving Fund Society, sometimes referred to herein as PSFS. The amount of the original deposit was $874.35. Additional deposits were made as follows: Date
Amount
October 21, 1954
$34,126.00
June 11, 1957
2,164.68
January 31, 1958
10,273.62
December 18, 1958
22,845.00
On July 2, 1956, the individual petitioners *217 withdrew from PSFS the amount of $15,000. PSFS credited interest to the savings account as follows: Date
Amount
December 31, 1954
$ 131.25
December 31, 1955
878.27
December 31, 1956
738.98
December 26, 1957
642.77
December 26, 1958
1,019.18
December 28, 1959
1,834.18
Total
$5,244.63
The balance in the savings account on December 31, 1959, was $60,528.28. All of the above interest in the total amount of $5,244.63 was omitted from the returns of the individual petitioners, with the exception of the amount of $878.27 for 1955, which latter amount was reported in the joint income tax return for 1955, "Schedule B - Income From Interest" as follows: Name of Payer
Amount
P.S.F.S.
$878.27
Greenberg always consulted Ada when making up the individual returns in order to get the personal deductions. He had a record of the salaries Samuel and Ada received from Camden and also from another corporation called Kayser & Allman, and the income they received from two partnerships called "Samuel Schultz and Company" and "Samuel and Ada Schultz". Both partnerships kept a complete set of books. Greenberg did not think the individual petitioners *218 had any income except from these four sources but in 1955 he asked Ada if they had received any interest and she said she had received $878.27 from the PSFS savings account. In preparing a current return, Greenberg usually kept before him a copy of the return for the prior year to serve as a guideline. On December 22, 1956, Greenberg mailed the retained copies of the individual returns for 1953 through 1955 to Leon Meltzer, an attorney, who was doing some legal work for the Schultz family. When Greenberg prepared the 1956 return for Samuel and Ada he did not have the copy of the 1955 return to serve as a guideline, and he inadvertently failed to ask Ada about interest income. When preparing the returns for subsequent years, the copy of the return for the prior year disclosed no interest income. The individual petitioners reported adjusted gross income for the taxable years in question in amounts as follows: Calendar
Adjusted
Year
Gross Income
1953
$ 34,368.21
1954
27,043.76
1955
29,555.82
1956
24,527.77
1957
32,162.10
1958
31,402.46
1959
43,939.96
Total
$223,000.08
Omitted from the above amount of $223,000.08 was the $25,270 received from the *219 parking lot and $4,366.36 from the PSFS savings account. No discussion ever took place relative to the omitted rental and interest income when Greenberg presented the returns of Camden and the individual petitioners for signing during the period here involved. Greenberg was never personally made aware, nor was any information ever made available from which he could deduce, that there was rental or interest income, except the interest income for 1955. Greenberg first learned that the parking lot was generating rental income in 1959 as a result of a revenue agent's investigation. Greenberg had no idea why there was no entry on any of the books of Camden regarding the rental income from the parking lot. Ada, who is 63, is a capable business woman with a good educational background. Samuel was born in Batum, Russia, on January 19, 1894, and he had a minimum of formal education, having gone as high as the fourth grade. He became a naturalized American citizen in 1918. Both Ada and Samuel have had serious illnesses. Ada has continuously handled all the personal financial matters for herself and her husband and made all the deposits, and drew and signed most of the checks for Camden *220 and the partnerships. Samuel and Ada had explicit confidence in Greenberg and relied upon him to prepare all the required tax returns. Ultimate Findings The omissions of income by Camden and the individual petitioners were inadvertent and were not made with any intention to defraud the Government. No part of any deficiency or underpayment here involved was due to fraud with intent to evade tax. The returns of Camden for the fiscal years ending November 30, 1953, through November 30, 1955, and the returns of the individual petitioners for the calendar years 1953 through 1955 were not false or fraudulent with intent to evade tax. Opinion The only issues involved in these proceedings are whether any of the petitioners was guilty of fraud with intent to evade tax and whether the statute of limitations bars the assessments of the deficiencies determined against the petitioners for the taxable years 1953 through 1955. The applicable statutes are in the margin. [2]
*221 These issues are of course factual questions which must be resolved by our consideration and weighing of all of the evidence. The burden of proving fraud is upon the respondent. Sections 1112, I.R.C. 1939, and 7454, I.R.C. 1954. The respondent must establish such fraud by clear and convincing evidence. Arlette Coat Co., 14 T.C. 751; John Marinzulich, 31 T.C. 487, 490; Welburn Mayock, 32 T.C. 966, 974. The requisite proof of fraud on the part of Camden is necessarily to be found in the acts of its officers. See Auerbach Shoe Co., 21 T.C. 191 (1953), affd. 216 F. 2d 693 (C.A. 1, 1954). We do not think the respondent has met his burden. Respondent has shown and petitioners frankly admit that two items of income were omitted from the corporate and individual returns. Camden reported a total gross income for the years in question of $503,563.80, but omitted rental income of $23,275. The individual petitioners reported a total of adjusted gross income for 7 years of $223,000.08 but omitted a total of $25,270 rental received from Rosenfeld (treated by respondent as informal dividends), and total *222 interest of $4,366.36. Samuel and Ada, as individuals and as officers of Camden, relied implicitly upon Greenberg who had prepared all of the returns (corporate and individual) since about 1939. Bookkeepers were employed to keep the books of Camden and the two partnerships. These books were audited once a month by persons employed by Greenberg. As to the omitted rental, Greenberg at all times, until informed differently in 1959 by a revenue agent, was under the impression that the parking lot was being operated by Atkins, rent-free. At the same time Samuel felt that the bookkeepers in Camden's office were well acquainted with the rental regarding the parking lot and that the proper records were being kept. When asked by the Court whether the first Brandt lease for the parking lot was made by him individually or by the corporation, Samuel replied: "I don't recall how it was made." He did not remember when he signed the first lease with Brandt whether he signed it as president of Camden or in his individual capacity. He knew that Camden owned the parking lot and, when asked by respondent's counsel why the rents from Brandt did not go into Camden's bank account, he replied: I needed *223 that money and I took that money to use it at that time. * * * I needed the money and I took it, and I understood that the office knew about it, yes. Not only could Samuel not explain why the name of the lessor of the first lease with Brandt was changed from "Camden Wall Paper Co." to "Samuel Schultz" but Greenberg testified that he "never" saw any of the Brandt leases nor any of the checks for the rental. Rosenfeld thought someone in his office made the change. His testimony in this regard, on direct examination for respondent, is partly as follows: Q. Mr. Rosenfeld, you mentioned that you prepared this lease previously marked for identification? A. Either we prepared it or had it prepared. Q. And you stated that it initially was with Camden Wall Paper Company? A. Initially, the name was Camden Wall Paper Company. Now, why the name was changed, I don't know. THE COURT: State how the lease was. Was it made with Schultz as a party or Camden Wall Paper? A. Oh, naturally it was with Camden Wall Paper Company and that was later stricken and Samuel Schultz was substituted. THE COURT: Maybe you intended that Camden Wall Paper do it, but when the lease was made and signed *224 with this other man Brandt, who was the lease between? A. Well, the lease was signed by Samuel Schultz, not by Camden Wall Paper Company. THE COURT: That's the point. BY MR. DEBERRY: Q. Mr. Rosenfeld, did you strike the Camden Wall Paper Company typing on there? A. I can't remember that. It was evidently stricken by our office but I can't remember who did it. Q. Did you insert the typing under there Samuel Schultz? A. Somebody must have. I don't know whether we did it or whether somebody in our office did it. I'm quite sure it must have been somebody in the office. On November 23, 1960, Schultz appeared voluntarily and without counsel at a question and answer session, under oath, taken down stenographically before a special agent of the Internal Revenue Service. At such session, he readily and openly discussed the entire case and, without equivocation, stated that he had received the rents at issue and that this had been done at his direction. After answering 266 questions, Schultz was asked whether he had anything he would like to add, to which he replied as follows: A. Somebody made a boo-boo when they didn't enter it. There wasn't anything that was done underhanded, *225 or I would say, to try to beat the government, because that is one thing I always did and you will find that in all my records that he always reported all assets, all the income and things. How this thing happened, I don't know. I still feel that I blame the accountant. Whether he didn't find it out from my wife or what it is, it is something that should have been done. I realize that; there was nothing hidden. The checks were deposited; the help in the office knew what was deposited. It wasn't that I was cashing his on the outside trying to grab some money, because I have no reason for doing it, because my business has been successful ever since I started. When I found out that that wasn't entered I just couldn't believe it. I gave him the devil but the thing was done and that is what happened. There is nothing you can do about it, but I still feel he is there practically every month making records and he knew we owned the parking lot. Why he didn't enter it I don't know. He could have just asked. After all, accountants ask questions and they are supposed to as far as what my business is, and I guess he didn't. That is all. But, if you want these records of deposits, checks, I have *226 got them all. I got every one and I can show you every check was deposited in the bank. You want any more information, I will give it to you. There seems to be no doubt that Samuel honestly believed, until shown otherwise by the revenue agents, that the checks for the parking lot rent were being reported as income by Camden, and that he probably did not appreciate the rule of law that since he was personally receiving the rent, it should be taxed first to the corporation as rental income and then to himself as informal dividends. In any event, we do not think respondent has sustained his burden of proof of fraud as far as the rental payments are concerned. We think the same is true as to the omitted interest of $4,366.36. We think these items of interest were inadvertently omitted with no intention to defraud the Government. At this point, we think it is appropriate to repeat the oft-quoted observation made by Judge Van Fossan more than 33 years ago, in Henry S. Kerbaugh, 29 B.T.A. 1014, affirmed per curiam, 74 F. 2d 749 (C.A. 1, 1935): A charge of fraud has always been regarded as a serious matter in the law. Not only is it never presumed, but the *227 ordinary preponderance of evidence is not sufficient to establish such a charge. It must be proved by clear and convincing evidence. * * * In John Marinzulich, supra, we said: Respondent emphasizes the consistent understatements of income by the petitioners on their income tax returns. It is not enough, however, to establish fraud merely by showing understatements of income. Holland v. United States, 348 U.S. 121; Blackwell v. United States, 244 F. 2d 423; James Nicholson, 32 B.T.A. 977, 989, affd., 90 F. 2d 978. Repeated understatements of income, of course, are evidence from which fraud may be inferred, Nathan Bilsky, 31 T.C. 35, but there must be something more in order to meet the "clear and convincing" test * * * In Merritt v. Commissioner, 301 F. 2d 484 (C.A. 5, 1962), rehearing denied April 13, 1962, affirming a Memorandum Opinion of this Court, the Court of Appeals for the Fifth Circuit said: The mere understatement of income, standing alone, is not enough to carry the burden cast upon the Commissioner in seeking to recover fraud penalties. But each case is to be considered in *228 the light of its own facts. * * * In Toledano v. Commissioner, 362 F. 2d 243 (C.A. 5, 1966), affirming in part, reversing in part, and remanding a Memorandum Opinion of this Court, the Court of Appeals for the Fifth Circuit said: The understatements of interest and dividend income were substantial and consistent. Being substantial and consistent these are evidence of fraud, but such evidence, without more is not enough to carry the Commissioner's burden to establish fraud by clear and convincing evidence. Merritt v. Commissioner, 5th Cir. 1962, 301 F. 2d 484. [Emphasis supplied.] In the Merritt case the Fifth Circuit Court concluded that there were facts present other than the mere failure to return income that warranted the imposition of the fraud penalty, while in the Toledano case the same Court of Appeals thought that the added facts there present were not enough to establish fraud. In the instant proceeding the understatement of income was much smaller in comparison with the understatement in Merritt. [3] In the instant proceeding the records as a whole were complete and well kept. It was an inadvertent oversight on the part of the bookkeepers *229 in not recording the rental income from the parking lot. In fact, Samuel honestly thought it was being handled properly. Camden reported a substantial amount of rent from other sources. As to the omitted interest of $4,366.36, Greenberg admitted he probably was derelict in his duty in not asking Ada if there was any interest. [4] He did it for 1955, and the interest for that year was reported but, in preparing the returns for the subsequent years, he usually kept before him a copy of the return for the prior year to serve as a guideline. He did not have the 1955 return before him when he prepared the 1956 return and inadvertently failed to ask about the interest income. As to interest, the same situation existed for the subsequent years. Samuel had a limited education and depended entirely upon Greenberg to see that all of the tax returns for Camden and the individuals were in order. We believe Samuel was telling the truth in the previously quoted statement he made to the special agent. Again, we say we do not think the respondent has met his burden of establishing fraud by clear and convincing evidence. Toledano v. Commissioner, supra; John Marinzulich, supra. *230 It may be noted in passing that the respondent recommended to the Department of Justice that the petitioners here be criminally prosecuted but that recommendation was denied. Also, it may be noted that petitioners offered to pay the outlawed deficiencies if respondent would waive the 50 percent addition to tax. At the hearing the following colloquy took place between opposing counsel: MR. DEBERRY: If the Court please, *231 Mr. Comisky stated that the taxpayer made an offer to pay the tax regardless of the statute of limitations. MR. COMISKY: Do you dispute that, Mr. DeBerry? MR. DEBERRY: Yes, I do. I have no knowledge of it. MR. COMISKY: I now state it openly to the Court. We would be happy to pay this deficiency if the Government agrees not to press the fraud penalty. MR. DEBERRY: Are you waiving the statute of limitations? MR. COMISKY: Yes, as to that, if the Government agrees not to impose a fraud penalty we will pay it. MR. DEBERRY: The answer is no, obviously. We hold that respondent has failed to prove that petitioners were guilty of fraud with intent to evade tax for the taxable years here in question, and that the statute of limitations bars the assessment of deficiencies against the petitioners for the taxable years 1953 through 1955. Decisions will be entered for the petitioners. Footnotes
1. Agreed to by petitioners (corporate and individual).↩
2. Internal Revenue Code of 1939: SEC. 293. ADDITIONS TO THE TAX IN CASE OF DEFICIENCY. * * *
(b) Fraud. - If any part of any deficiency is due to fraud with intent to evade tax, then 50 per centum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed, collected, and paid, in lieu of the 50 per centum addition to the tax provided in section 3612(d)(2). SEC. 275. PERIOD OF LIMITATION UPON ASSESSMENT AND COLLECTION. Except as provided in section 276 - (a) General Rule. - The amount of income taxes imposed by this chapter shall be assessed within three years after the return was filed, and no proceeding in court without assessment for the collection of such taxes shall be begun after the expiration of such period. * * *
SEC. 276. SAME - EXCEPTIONS. (a) False Return or No Return. - In the case of a false or fraudulent return with intent to evade tax or of a failure to file a return the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time. Internal Revenue Code of 1954: SEC. 6653. FAILURE TO PAY TAX. * * *
(b) Fraud. - If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a). SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. (a) General Rule. - Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) * * *
(c) Exceptions. - (1) False return. - In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time.↩
3. In Merritt for seven years the understatement was over $80,000 compared with $103,000 of reported income. In Camden, for six years it was $23,275 compared with $503,563.80 of reported income; and for the individual petitioners, Samuel and Ada, for seven years it was $29,636.36 compared with $223,000.08 of reported income. ↩
4. At the hearing, the Court asked Greenberg what he was doing when he made out the individual returns. Greenberg answered: A. Personally, I say after they moved upstairs, from Front Street, I depended on Mrs. Schultz to give me any other income or expenses they might have had. It seemed unimportant to go through all their checks when they simply could give me the medical expenses. I admit I was derelict in my duty at this particular time.↩