Ed Klemach and Wilma Klemach v. Commissioner.
Klemach v. Commissioner
Docket No. 3038-69.
United States Tax Court
T.C. Memo 1971-169; 1971 Tax Ct. Memo LEXIS 162; 30 T.C.M. (CCH) 723; T.C.M. (RIA) 71169; July 20, 1971, Filed *162 Held, petitioners' underpayment of taxes for 1958 through 1963 was not due to fraud, sec. 6653(b), I.R.C. 1954; nor did they file false or fraudulent returns with the intent to evade tax for those years, sec. 6501(c)(1), I.R.C. 1954. Frank H. Boyer, 1520 N. Woodward Ave., Bloomfield Hills, Mich., and Michael J. Mehr, for the petitioners. Chauncey W. Tuttle, Jr., for the respondent. FEATHERSTON
Memorandum Findings of Fact and Opinion FEATHERSTON, Judge: Respondent determined deficiencies and overassessments in petitioners' income tax and additions to tax under section 6653(b) as follows: Additions
to Tax
Over-
Year
Amount
Sec. 6653(b)
assessment
1958
$25,822.43
$12,911.22
1959
43,709.62
21,854.81
1960
4,806.35
32,981.39
1961
4,478.18
27,302.41
1962
30,124.87
$1,066.02
1963
29,725.53
1,957.46
Concessions have been made by both parties, and the issues remaining for decision are as follows: (1) Whether the underpayments of tax for 1958 through 1963 were due to fraud within the meaning of section 6653(b); [1]
(2) Whether the statute of limitations bars the assessments and collection of alleged deficiencies in income taxes and additions to to the tax for 1958 and 1959; and, if *164 not, (3) Whether petitioners' distributive share of partnership income derived from General Roofing and Construction Company was understated in their income tax returns for 1958 and 1959. Findings of Fact Ed Klemach (hereinafter referred to as petitioner) and Wilma Klemach, husband and wife, were legal residents of Gladwin, Michigan, at the time their petition was filed. They filed joint Federal income tax returns for the years in issue with the district director of internal revenue, Detroit, Michigan. Petitioner was born May 11, 1899, on a farm near Gladwin, Michigan, and lived there until he was 12 years old, when his family moved to Saginaw, Michigan. Shortly after the move to Saginaw his father died, and petitioner, having completed the eighth grade in school, was forced to quit and take a job as a hotel bellhop in order to help support the family. After a couple of years, he went to work for a carpenter, serving as his apprentice, and, during this period, he learned the trade of carpentry. Upon completing his apprenticeship, he worked as a carpenter for various *165 building contractors until 1946, when he and Ed Bear, Jr. (hereinafter Bear), formed a partnership known as General Roofing and Construction Company (hereinafter referred to as General) in which each owned a 50 percent interest. When the partnership was formed, the business consisted of home improvement and repair work, including remodeling houses, building garages, and doing masonry work. Sometime thereafter, however, the business evolved into a wooden door manufacturing operation. During the years in issue, General employed, on an average, 15 to 20 men in addition to Bear and Klemach. Since petitioner was most familiar with carpentry, he took charge of all the carpentry work and supervised the employees hired to do remodeling and improvements. When the partnership began making doors, he took charge of the manufacturing and shipping aspects. In addition, under the supervision of Bear, petitioner prepared the weekly payroll checks for the employees. This work consisted of adding the hours on the time cards, determining the gross salary for each employee, computing the necessary deductions in accordance with a table contained in a government publication, and 724 preparing the *166 checks. Petitioner's payroll book was reviewed by Bear each week. Aside from the payroll, petitioner's only connection with the office work was to sign checks when asked to do so by Bear; to take any orders which might come to the office in Bear's absence; to quote prices from a price list prepared by Bear when Bear was unavailable; and on occasion to pay bills when they were due if Bear was not there. Bear's background differed from that of petitioner. He had received a Bachelor of Science degree in Architectural Engineering from Iowa State University, and, prior to the formation of the partnership, had worked as an engineer for a manufacturing company. All of the business aspects of the partnership were handled by Bear. His work included the ordering of all raw material, machinery and equipment, negotiating all sales, arranging financing, and taking care of all bookkeeping records, such as paying bills, sending invoices, preparing price lists, and performing other duties incidental to office matters. In addition to all the partnership office work, Bear handled many of petitioner's personal financial affairs. During the years in issue, the partnership maintained two checking accounts *167 at the Michigan National Bank in Saginaw. One account (hereinafter referred to as the general account) was carried in the name of General, and the other account (hereinafter referred to as the special account) was maintained in the names of Ed Klemach and Ed Bear, Jr. Each partner was authorized to sign checks individually on both accounts. The general account was used to pay the partnership's bills and expenses incurred in the general operation of the business, including the payroll. The special account was used primarily for distributions of funds to the partners. These distributions took the form of cash and payments of the financial obligations of the partners. Many of the cash distributions represented amounts equal to discounts received by General on purchaes of lumber. During the years in issue, petitioner did not maintain a personal checking account of his own. He would present to Bear any bills he wished to have paid, and Bear would pay them with a check drawn on the special account. Any of petitioner's bills not paid by a check from the special account would be paid with cash. Bear's office duties during the years in issue also included preparation of the partnership *168 Federal income tax returns. He prepared these returns, signed them, and filed them with the Internal Revenue Service. Aside from counting the inventory at Bear's request, petitioner did not assist in the preparation of these returns and did not review them prior to their filing. All determinations of partnership income and expense were made by Bear without petitioner's help. In conjunction with the handling of petitioner's personal affairs, Bear prepared petitioner's joint Federal income tax returns for the years in issue and had been doing so since about 1950. Petitioner had never made out an income tax return for himself. Upon Bear's request, petitioner provided the needed information on nonpartnership items. This data included interest income and other personal items, but did not include any information on partnership income. In some instances petitioner and his wife would sign blank returns and leave them with Bear, and he would fill them out and file them. This procedure was followed when petitioner left for his annual Florida vacation before Bear had time to complete the returns. On these occasions, Bear also would sign the checks drawn on the special account to pay petitioner's *169 tax. In those years that petitioner was in Florida when the returns were filed, Bear would write to him and tell him his taxes had been paid. During none of the years in issue did petitioner or his wife review their tax returns, either before or after they were filed. Bear signed each of the checks which accompanied petitioner's income tax returns for 1958 through 1962. During the years in issue, petitioner maintained savings accounts at a number of banks and savings and loan associations. He made deposits of funds drawn from the checking accounts of General. All the interest income from these savings accounts was reported in the tax returns filed for petitioner. In addition, petitioner bought a house for his wife's mother; made gifts to his grandchildren of $10,000 each; purchased a house in Gladwin in 1959 for $10,000, paying $4,000 as part of the purchase price; had a home constructed in Saginaw; and purchased several automobiles. The funds for all of these gifts and purchases came from the partnership. Petitioner made withdrawals and received 725 distributions from partnership bank accounts as follows: Fiscal Year
Ending
Sept. 30
Withdrawals
1959
$ 49,465.00
1960
37,812.95
1961
70,351.86
1962
145,437.50
1963
152,364.30
*170 On June 1, 1963, General's operating assets were sold. Thereafter on June 26, 1963, petitioner opened a personal checking account with a deposit of $10,000 obtained from one of the partnership checking accounts. In April 1965, respondent started an investigation of the income tax returns of Bear, petitioners, and the partnership. Later that year, Bear and petitioner engaged the services of Ray Oldham (hereinafter Oldham), a C.P.A., who prepared books of account for the partnership for 1960 through 1963. On May 10, 1966, petitioner filed amended joint income tax returns, prepared by Oldham, for each of the taxable years 1960 through 1963. The following schedule reflects petitioner's partnership income reported on the original returns for each of the years in issue and the income as reported on the amended returns: Original
Taxable
Income
Amended
Year
Tax Return
Return
1958
$19,250.00
None filed
1959
25,960.15
None filed
1960
24,300.00
$118,787.65
1961
24,500.00
104,091.97
1962
24,000.00
118,121.99
1963
13,591.65
108,560.17 The difference in income taxes due as shown on the original and amended returns for the years 1960 through 1963 *171 was attributable exclusively to the understatement of ordinary income from the partnership. On March 23, 1967, Klemach and Bear were each indicted by a Federal grand jury for alleged fraudulent evasion of Federal income taxes for 1960 through 1963 on the basis of an alleged understatement of income from General. On November 14, 1967, Bear entered a plea of guilty with respect to all counts of the indictment, was fined, and received a suspended sentence with 5 years probation. The indictment against petitioner was dismissed on motion of the United States Attorney on November 16, 1967. Respondent in his notice of deficiency determined that there were understatements of petitioners' income from the partnership for 1958 through 1961, and (with respect to the amended returns) overstatements for 1962 and 1963. He also determined that all or part of the underpayments of tax as reported in the original returns for 1958 through 1963 was due to fraud; and on this ground, he determined that 50 percent of such underpayments should be added to the tax as provided by section 6653(b). Ultimate Findings of Fact Petitioners' underpayment of income taxes for 1958 through 1963 was not due to *172 fraud within the meaning of section 6653 (b); nor did petitioners file false or fraudulent returns with the intent to evade tax within the meaning of section 6501(c)(1) for 1958 and 1959. Opinion The principal issue for decision is whether petitioners' underpayment of taxes on the original returns for 1958 through 1963 was due to fraud within the meaning of section 6653(b).[2] The burden of proving fraud is placed upon the respondent. Estate of Ernest Clarke, 54 T.C. 1149, 1162 (1970), acq. 1970-2 C.B. xix, and, to satisfy this burden, he must establish fraud by clear and convincing evidence. Drieborg v. Commissioner, 225 F. 2d 216, 218 (C.A. 6, 1955), reversing on another issue a Memorandum Opinion of this Court. *173 This case presents a somewhat unique factual situation. Petitioner does not challenge the determination that there were underpayments of tax for 1960 through 1963. Rather he alleges that the underpayments for those years, as well as any deficiencies for 1958 and 1959, were due to the activities of his former partner, Bear. Petitioner contends that he was 726 unaware that there were understatements of his partnership income; and, consequently, he alleges, he is not guilty of fraud with respect to any underpayments. The concept of fraud "implies bad faith, intentional wrongdoing, and a sinister motive," L. Glenn Switzer, 20 T.C. 759, 765 (1953). The test is the intent at or before the time the return is filed, not some later date. Harry Gleis, 24 T.C. 941 (1955), affirmed per curiam, 245 F. 2d 237 (C.A. 6, 1957). Whether fraud exists in any particular case depends entirely on the facts of that case. Before turing to an analysis of the evidence, we observe that our conclusion is not controlled by the dismissal on the motion of the United States Attorney of the indictment against petitioner for alleged fraudulent evasion of Federal income *174 taxes for 1960 through 1963. Petitioner argues that "the decision not to proceed against Klemach was a tacit admission by the United States government that a cause of action did not exist," but the Government's burden of proof in a criminal case is more onerous than in a civil fraud case. See Helvering v. Mitchell, 303 U.S. 391 (1938). Although the dismissal may reflect the United States Attorney's conclusion that he did not think the evidence available to him would support a conviction, the decision here must be made in the light of the evidence presented at the trial. There is no denying that there were understatements of petitioner's income - and in some years these understatements were quite large. In addition, the evidence indicates that petitioner was aware that large amounts of income were being derived from the partnership, since most of this money either went directly to him in the form of cash withdrawals or, at his direction, was used to pay his personal liabilities. These factors lead one to suspect that the understatements of income were due to petitioner's fraud. However, fraud is "never imputed or presumed. Mere suspicion of fraud and mere doubts as to *175 the intentions of the taxpayer are not sufficient proof of fraud." L. Glenn Switzer, supra at 765 and cases cited therein. "[There] must be something more in order to meet the 'clear and convincing' test." John Marinzulich, 31 T.C. 487, 490 (1958), acq. 1958-1 C.B. 4. While understatements of income in successive years is some evidence of fraud, this factor alone, if not "coupled with other circumstances - so-called badges of fraud - showing intent to conceal or misstate taxable income," Estate of Ernest Clarke, supra, at 1162, may not be sufficient to establish fraud. Although the total amounts received by petitioner from the partnership substantially exceeded the amounts reported as income in his returns, the other circumstances do not show that he was aware of the discrepancies. His annual partnership receipts were not lump sums. There is no indication that he kept any record of the withdrawals and compared them with his returns. He trusted Bear implicitly, relying on him to pay his bills and handle his personal business affairs, as well as prepare his tax returns. Their relationship had been long and harmonious, and there *176 is no evidence that petitioner suspected any wrongdoing. In deciding whether petitioner had the intent to evade taxes, we must also "consider * * * [his] native equipment and * * * [his] training and experience," Cleveland Thurston, 28 T.C. 350, 355-356 (1957), acq. 1957-2 C.B. 7. Petitioner had no training or experience with regard to accounting or tax matters, and his education stopped at the eighth grade. He had no experience in the office end of the business - he was the shop man. He took little or no part in the active business conduct of the partnership - his activities were restricted almost entirely to the manufacturing phase and to the supervision of the employees. He had never prepared his own income tax return. Before forming the partnership with Bear, the evidence indicates petitioner's former employer prepared his returns for him, and he continued that pattern during the years in issue, relying entirely upon Bear to compute the partnership income and to prepare his returns. There is nothing to suggest that petitioner had any knowledge of Bear's deliberate understatement of partnership income, and all the testimony on the point indicates *177 that petitioner lacked the "native equipment," "training," and "experience" to verify the correctness of Bear's computations even if he had undertaken to do so. 727 Petitioner's lack of fraudulent intent is further evidenced by his limited activities with regard to his tax returns. When Bear asked for the personal information needed for the tax returns, such as his interest income, petitioner did not withhold or attempt to conceal any of it. Each year he claimed only the standard deduction. Significantly, the deficiencies for every year were due solely to the understatement of partnership income, and the amount of that income was computed solely by Bear with no substantial help from petitioner. The evidence indicates that petitioner was not aware of the understatements until so informed by Oldham several years after the returns were filed. By no stretch can it be said that he supplied the erroneous data incorporated in the partnership returns. Cf. Drieborg v. Commissioner, supra. Finally, petitioner, at all times during the investigation of his returns, was completely cooperative. Throughout the investigation, he maintained that he had nothing to do with the *178 computation of the partnership income shown in any of the returns, and Bear's testimony supports this assertion. He did not contest the underpayments of taxes for 1960 through 1963 reflected in Oldham's calculations and filed amended returns, paying the taxes and interest owing for these years; assessments for 1958 and 1959 were then barred, except for fraud. We recognize that cooperation with an investigating agent is not always a reflection of innocence; however, we believe petitioner's cooperation is consistent with his contention that he did not know that Bear, evidently for his own purposes, had falsified the partnership returns. In retrospect, petitioner was negligent in not exercising greater care in the supervision of his own personal affairs and was guilty of poor judgment in not verifying the correctness of his income tax returns. His trust in Bear was misplaced. However, "Negligence, careless indifference, or disregard of rules and regulations do not suffice to establish fraud." Cleveland Thurston, supra at 355. Furthermore, poor judgment and ignorance are not tantamount to fraud. "There is lacking one essential element, the very heart of the fraud issue, *179 namely, the intent to defraud the Government by calculated tax evasion." E. S. Iley, 19 T.C. 631, 635 (1952), acq. 1953-2 C.B. 4. We are not satisfied that respondent has carried his burden of showing by clear and convincing proof that petitioner's underpayments were due to fraud. We are left with the issue as to whether respondent is barred by the statute of limitations from assessing and collecting deficiencies in income taxes and additions to tax for 1958 and 1959. Section 6501(a) states that - the amount of any tax imposed * * * shall be assessed within 3 years after the return was filed * * * and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period. In the case of substantial omissions of income, this 3-year statute of limitations is extended for a longer period under section 6501(e)(1)(A) as follows: If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at *180 any time within 6 years after the return was filed. * * * However, section 6501(c) provides as an exception: (1) False Return. - In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time. For the reasons set forth above, we hold that petitioners did not file false or fraudulent returns with the intent to evade tax for 1958 and 1959; and, consequently, the assessment for those years is barred by the statute of limitations. To properly reflect our Findings and concessions made by the parties, Decision will be entered under Rule 50. 728 Footnotes
1. All section references are to the Internal Revenue Code of 1954 as in effect during the years in issue.↩
2. SEC. 6653. FAILURE TO PAY TAX. * * * (b) Fraud. - If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under section (a). In the case of a joint return under section 6013, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse.↩