Joseph Kendzie and Sophie Kendzie v. Commissioner.
Kendzie v. Commissioner
Docket No. 3665-64.
United States Tax Court
T.C. Memo 1968-174; 1968 Tax Ct. Memo LEXIS 124; 27 T.C.M. (CCH) 845; T.C.M. (RIA) 68174; August 8, 1968. Filed L. Robert Leisner, Rand Bldg., Buffalo, N. Y., for the petitioners. John E. White, for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent has determined deficiencies in petitioners' income taxes and additions to taxes as follows: 1939 Code
1954 Code
Income
Sec. 294
Year
Tax
Sec. 293(b)
(d)(1)(A)
Sec. 6653(b)
1947
$2,194.94
$ 1,097.47
1948
1,414.18
707.09
149.61
1949
2,611.70
1,305.85
264.74
1950
6,906.56
3,453.28
621.58
1951
* 6,660.02
3,330.01
601.67
1952
* 2,567.57
1,283.79
225.07
1953
* 945.80
472.90
115.91
1954
* 1,770.83
207.59
$885.42
*125 in 1954.
* Includes self-employment tax of $81 in 1951 through 1953 and $ 108 The questions for decision are whether respondent correctly determined the asserted deficiencies through the use of the net worth method, and (if so) as to each of the years, whether any part of such deficiency is dur to fraud. Absent fraud the statute of limitations applies to each year in issue. Findings of Fact Some of the facts have been stipulated and are so found. Petitioners, Joseph and Sophie Kendzie (hereinafter sometimes referred to as petitioners or individually as Joseph and Sophie, are husband and wife who at all relevant times since they were married in 1935 have resided in Lockport, New York. For the taxable years 1947 through 1951, [1] inclusive, Joseph and Sophie filed joint Federal income tax returns with the collector of internal revenue at Buffalo, New York. For the taxable years 1952 through 1954, inclusive, the petitioners filed joint Federal income tax returns with the district director of internal revenue at Buffalo, New York. *126 In October of 1939, the petitioners opened a restaurant on property which they owned at 17 Richmond Avenue in Lockport, New York, (hereinafter sometimes referred to as the Richmond property). A liquor license allowing them to serve alcoholic beverages was issued in November of the same year. Petitioners generally operated the business by themselves, employing only occasional help. During the years in issue and until petitioners sold this business in March 1950, its operation remained virtually unchanged. Drinks were priced from 5 cents for a short beer to 25 cents for a large 846 whiskey, and the clientele was almost entirely laboring men. During all relevant times petitioners lived on the second floor of the building on the Richmond property with their two children, the eldest of whom was born in 1938. Sophie's father, Andrew Figura, also resided with them from 1945 until his death in 1961. Figura was retired during this period, having formerly been employed at Simonds Saw & Steel Co. as the head inspector of all finished products, no item being shipped without its having passed his inspection. He received a pension during this period, and had savings derived from 40-years' *127 service at Simonds, including amounts earned when he was recalled on a full-time basis during the Second World War. Petitioners' apartment was modestly furnished, lacking such items as a radio, television, phonograph, or private telephone. Heat and light bills were based on the total consumption for the entire Richmond building, a single meter being used for the restaurant and the living quarters. The total light bill was about $4 or $5 a month. There is no evidence as to the total amount of the heat bill. The petitioners' clothing and food expenses were modest. Both worked in the restaurant during the day, she wearing a uniform and he wearing a jacket and trousers. Generally they consumed the same food as was served in the restaurant. Their working hours were long, lasting usually until 2 a.m., leaving little time for entertainment. The family personal living expenses during the years in issue were $1,650 yearly from 1947 through 1950, and $1,800 for 1951 through 1954. In 1946 or 1947 additions were added to both the first and second floors of the Richmond Street property. Andrew Figura paid a portion of the cost of these improvements, however, no substantial evidence was *128 introduced which established a specific amount as the total cost of the additions. In March of 1950 the Richmond Street business was sold to Edward Kendzie, Joseph's brother, for $3,500, and at about the same time the petitioners acquired property at 11-13-15 West Main Street in Lockport (hereinafter sometimes referred to as the Main Street property) at a total cost of $17,665.59. This property contained a three - story burned-out theater building which petitioners eventually had torn down in order to construct a new building which housed a restaurant and a 12-lane bowling alley. The restaurant-bowling alley combination was opened in October 1951. Petitioners intended to sell liquor at the establishment, but were unable to obtain a liquor license until 1954 when they obtained a court order requiring the State Liquor Authority to issue one to them. Cf. Kendzie v. O'Connell, 283 App. Div. 256 (1954), 127 N.Y.S. 2d 380. After the license was issued petitioners' business showed a marked improvement. It had improved gradually until that time. Neither Joseph nor Sophie had formal training in accounting or bookkeeping methods. Joseph left school at the end of the fifth *129 grade and worked delivering bread until he and Sophie opened the Richmond Street restaurant in 1939. Sophie completed three years of high school, during which time she took a "regular program" which did not include any type of bookkeeping course. After she left school, she worked as a solderer in a radiator plant for 8 or 9 years, and until petitioners were married. Petitioners' business records consisted of check stubs and cash register tapes for the Richmond Street business in addition to various bills and invoices, all of which were turned over to an accountant for proper recording. When the combination bowling alley and restaurant was opened, similar records were kept. In addition Joseph recorded income from operations in a single entry ledger book. Records were also kept in regard to the number of lines bowled in order to determine the payroll for the pin boys at the bowling alley. Neither petitioner was trained in bookkeeping or accounting methods and therefore their accountant prepared all financial statements and income tax returns for them. Neither Sophie nor Joseph understood how the amounts shown on the returns were derived. For the years 1947 through 1954, petitioners *130 reported the following amounts of adjusted gross income: Year
Adjusted
Gross Income
1947
$2,883.42
1948
4,333 .97
1949
4,894.52
1950
1,808.02
1951
3,173.04
1952
2,329.09
1953
4,622.83
1954
5,775.20 847 In 1956, agents of the Internal Revenue Service began investigating petitioners' income tax returns and requested their books and records. Canceled checks, bank statements, and the single entry record were made available to them. The cash register receipts were missing at that time, as were some of the bank records and some canceled checks. The agents analyzed the records provided and found inconsistent totals for the books, the returns and the checks, but respondent has not seen fit to put the nature or the amount of such inconsistencies into evidence. The agents also went to banks, the county clerk's office, suppliers, contractors and some of petitioners' relatives in order to get additional information as to petitioners' assets, sources of income, and expenses. Reports submitted to the State Liquor Authority in regard to the application for the Main Street license were also examined. In the course of their examination, the agents found *131 no evidence of false entries, erasures, nor "duplicate" sets of books or records. They found no evidence to indicate any outside source of taxable income, or that any records had been destroyed or assets or bank accounts concealed. They were also satisfied that Joseph paid all or nearly all of his bills by check. On March 10, 1958, Joseph Kendzie was indicted for income tax evasion and filing false income tax returns for the calendar years 1951 through 1954, inclusive. He was subsequently found not guilty on all counts in a trial held in Buffalo in November 1962. On May 18, 1964, respondent sent petitioners the statutory notice of deficiencies herein, covering the years 1947 through 1954. His determinations of the deficiencies in tax were based upon the net worth method of reconstructing income. Attached to the statutory notice were schedules A through F. purporting to show the petitioners' increases in net worth from 1945 through 1954. These schedules are reproduced below. Modifications agreed to by respondent and mathematical inconsistencies apparent on the faces of the schedules are shown as footnotes to the schedules. Those amounts which are stipulated are so marked. 848 *132 SCHEDULE A (Understated Adjusted Gross Income)
Joseph and Sophie
12/31/45
12/31/46
12/31/47
12/31/48
12/31/49
Kendzie Computation of
Net Worth Increases
Years 1947 to 1954
Inclusive
Total Assets
42037.58
47906.47
59702.74
66563.04
85409.64
Total Liabilities
2363.16
3289.32
6951.86
5432.62
6651.54
Net Worth
39674.42
44617.15
52750.88
61130.42
78758.10
Less: Prior Year's Net
39674.42
44617.15
52750.88
61130.42
Worth
Net Worth Increase
4942.73
8133.73
8379.54
17627.68
Plus: Net Worth
3750.00
4000.00
4000.00
Adjustments
Total
11883.73
12379.45
17627.68
Less: Gifts
4000.00
Adjusted Gross Income
11883.73
12379.45
17627.68
as Corrected
Less Adj. Gross
2883.42
4333.97
4894.52
Income-Per Return
Understatement
9000.31
8045.48
12733.16
Adjusted Gross Income
SCHEDULE A (Understated Adjusted Gross Income)
Joseph and Sophie
12/31/50
12/31/51
12/31/52
12/31/53
12/31/54
Kendzie Computation of
Net Worth Increases
Years 1947 to 1954
Inclusive
Total Assets
121818.43
257971.64
258082.82
257439.25
261197.79
Total Liabilities
13552.95
127557.33
118100.73
112539.77
107371.65
Net Worth
108265.48
130414.31
139982.09
144899.48
153826.14
Less: Prior Year's Net
78758.10
108265.48
130414.31
139982.09
144899.48
Worth
Net Worth Increase
29507.38
22148.83
9567.78
4917.39
8926.66
Plus: Net Worth
3816.75
4566.75
4000.00
4000.00
4000.00
Adjustments
Total
29324.13
26715.58
13567.78
8917.39
12926.66
Less: Gifts
4000.00
Adjusted Gross Income
29324.13
26715.58
13567.78
8917.39
12926.66
as Corrected
Less Adj. Gross
1808.02
3173.04
2329.09
4622.83
* 4944.11
Income-Per Return
Understatement
27516.11
23542.54
11238.69
4294.56
7982.55
Adjusted Gross Income
*133 * 1954 Net income used by respondent. The Adjusted Gross Income reported by petitioners was $5775.20
SCHEDULE B (Total Assets)
Joseph & Sophie
Kendzie Statement of
Net Worth - As
Adjusted
Years 1947-1954
12/31/45
12/31/46
12/31/47
12/31/48
12/31/49
Inclusive
Assets
Cash on Hand
$22,000.00
$ 2,404.04
$ 1,000.00
$ 1,000.00
$ 1,000.00
Marine Trust Co. -
4,820.01
2,322.45
3,229.16
4,603.10
6,922.06
Checking Ac- count [1]
Marine Trust Co. -
2,620.05
* 6,208.15
Savings Ac- count
#16063 [1]
M. & T. Trust Co. -
1,782.91
Checking Account [1]
M. & T. Trust Co. -
1,491.10
4,053.55
6,086.39
Savings Ac- count
#3796 [1]
SCHEDULE B (Total Assets)
Joseph & Sophie
Kendzie Statement of
Net Worth - As
Adjusted
Years 1947-1954
12/31/50
12/31/51
12/31/52
12/31/53
12/51/54
Inclusive
Assets
Cash on Hand
$ 1,000.00
$ 1,000.00
$ 1,000.00
$ 1,000.00
$ 1,000.00
Marine Trust Co. -
473.22
2,136.78
2,155.74
576.21
3,643.57
Checking Ac- count [1]
Marine Trust Co. -
74.66
75.58
77.08
78.61
80.17
Savings Ac- count
#16063 [1]
M. & T. Trust Co. -
Checking Account [1]
M. & T. Trust Co. -
100.00
101.00
103.78
105.85
107.96
Savings Ac- count
#3796 [1]
*134 * Stipulated to actually be $6,221.69. 849 SCHEDULE B (Total Assets) - Continued
Joseph & Sophie
Dendzie Statement
of Net Worth - As
Adjusted
Years 1947-1954
12/31/45
12/31/46/
12/31/47
12/31/48
12/31/49
Inclusive
Farmers &
108.57
110.19
1,818.21
4,726.98
6,321.98
Mechanics Savings
Account #69221 [1]
U.S. Savings
1,515.00
1,515.00
1,515.00
1,515.00
1,515.00
Bonds [1]
Lockport Savings
5.00
17.50
440.00
& Loan Assoc.
#791 [1]
Lockport Savings
5.00
17.50
** 17.50
440.00
& Loan Assoc.
#792 [1]
Bright St. Lots
#25 & 27
17 Richmond Ave.
8,000.00
8,000.00
8,000.00
8,000.00
8,000.00
(Bldg.) [1]
17 Richmond Ave.
4,000.00
4,000.00
4,000.00
4,000.00
4,000.00
Bar & Kitchen
Eqpt. [1]
17 Richmond Ave.
1,200.00
1,200.00
1,200.00
1,200.00
1,200.00
Bldg Impr. [1]
17 Richmond Ave.
394.00
394.00
394.00
394.00
394.00
Bar [1]
17 Richmond Ave.
12,292.88
25,610.06
25,610.06
25,610.06
Additions (1946,
47 & 48)
81 South St. [1]
5,000.00
5,000.00
5,000.00
5,000.00
214 Park Ave. [1]
6,000.00
Bright St. Lot
400.00
#21 [1]
Bright St. Lots
1.00
#17 & 19 [1]
Olcott, N. Y.
7,500.00
Cottage [1]
13 W. Main St.,
Buick Bldg
13 W. Main St.,
Land
13 W. Main St.,
Bldg. Remodel
13 W. Main St.,
Bowling Alleys
13 W. Main St.,
Add'l Cost Bldg
13 W. Main St.,
Cash Register
13 W. Main St.,
Restr. Fixtures
13 W. Main St.,
Alleys Fall
Equipment
Auto - 1947
2,900.00
2,900.00
2,900.00
Lincoln [1]
Merchandise
2,875.00
3,510.21
905.30
1,471.00
Inventory [1]
Total Assets
$42,037.58
$47,906.47
$59,702.74
$66,563.04
$85,409.64
*135 SCHEDULE B (Total Assets) - Continued
Joseph & Sophie
Dendzie Statement
of Net Worth - As
Adjusted
Years 1947-1954
12/31/50
12/31/51
12/31/52
12/31/53
12/31/54
Inclusive
Farmers &
192.09
114.74
117.33
120.36
123.70
Mechanics Savings
Account #69221 [1]
U.S. Savings
Bonds [1]
Lockport Savings
& Loan Assoc.
#791 [1]
Lockport Savings
& Loan Assoc.
#792 [1]
Bright St. Lots
#25 & 27
17 Richmond Ave.
8,000.00
8,000.00
8,000.00
8,000.00
8,000.00
(Bldg.) [1]
17 Richmond Ave.
4,000.00
4,000.00
4,000.00
4,000.00
4,000.00
Bar & Kitchen
Eqpt. [1]
17 Richmond Ave.
1,200.00
1,200.00
1,200.00
1,200.00
1,200.00
Bldg Impr. [1]
17 Richmond Ave.
394.00
394.00
394.00
394.00
394.00
Bar [1]
17 Richmond Ave.
25,610.06
25,610.06
25,610.06
25,610.06
25,610.06
Additions (1946,
47 & 48)
81 South St. [1]
5,000.00
214 Park Ave. [1]
Bright St. Lot
400.00
400.00
400.00
400.00
400.00
#21 [1]
Bright St. Lots
1.00
1.00
1.00
1.00
1.00
#17 & 19 [1]
Olcott, N. Y.
7,500.00
7,500.00
7,500.00
7,500.00
7,500.00
Cottage [1]
13 W. Main St.,
***
16,500.00
16,500.00
16,500.00
16,500.00
Buick Bldg
16,500.00
13 W. Main St.,
***
1,121.13
1,121.13
1,121.13
1,121.13
Land
1,121.13
13 W. Main St.,
30,000.00
30,000.00
30,000.00
30,000.00
30,000.00
Bldg. Remodel
13 W. Main St.,
3,600.00
40,000.00
40,000.00
40,000.00
40,000.00
Bowling Alleys
13 W. Main St.,
13,242.27
101,500.00
101,500.00
101,500.00
101,500.00
Add'l Cost Bldg
13 W. Main St.,
1,500.00
1,500.00
1,500.00
1,500.00
Cash Register
13 W. Main St.,
13,500.00
13,500.00
13,500.00
13,500.00
Restr. Fixtures
13 W. Main St.,
1,116.20
1,116.20
Alleys Fall
Equipment
Auto - 1947
2,900.00
2,900.00
2,900.00
2,900.00
2,900.00
Lincoln [1]
Merchandise
510.00
417.35
502.70
315.83
1,000.00
Inventory [1]
Total Assets
$121,818.43
$257,971.64
$258,082.82
$257,439.25
$261,197.79
*136 ** Stipulated to actually be $257.50. *** Total cost of land and bldg. stipulated as $17,665.59 - Allocation not disputed. 850 SCHEDULE C (Total Liabilities)
Joseph & Sophie
Kendzie Statement
of Net Worth - As
Adjusted
Years 1947-1954
12/31/45
12/31/46
12/31/47
12/31/48
Inclusive
12/31/54
Liabilities
Outstanding
$ 118.76
$ 1,478.16
$ 87.89
Checks
Mortgage Payable
Marine Trust Co.
Loan Payable -
Marine Trust Co.
Notes Payable -
E. Britt
Notes Payable -
Walter Kendzie
Notes Payable -
Carl Morajko
7,000.00
7,000.00
* 7,000.00
Accounts Payable:
Brunswick Balke
(Alleys)
Brunswick Balke
Modernization
Brunswick Balke
Fall Dating
Brunswick Balke
Fall Dating
National Cash
Register
Contractors:
Queen City Glass
Co
Albert R.
Rumschik
Nelson Wright
Harold Rising
Lockport Linoleum
Vincent Lardner
Newfane Lumber
Higgins & Wright
572.11
Walter Bobzim
600.00
Ulrich Sign Co
W. N. Y. Collum
Acoustical Co
*
McGonigle &
Hilger
Reserve for
Depreciation
17 Richmond Ave
2,363.16
3,170.56
4,301.59
$5,432.62
6,563.65
13 W. Main St
Total Liabilities
$ 2,363.16
$ 3,289.32
$ 6,951.86
$ 5,432.62
$ 6,651.54
***
*137 SCHEDULE C (Total Liabilities)
Joseph & Sophie
Kendzie Statement
of Net Worth - As
Adjusted
Years 1947-1954
12/31/49
12/31/50
12/31/51
12/31/52
12/31/53
Inclusive
12/31/54
Liabilities
Outstanding
$ 514.57
$ 621.05
$ 1,878.05
$ 89.36
* $ 337.67
Checks
Mortgage Payable
67,941.90
63,186.52
56,390.50
* 49,782.69
Marine Trust Co.
Loan Payable -
5,000.00
*
Marine Trust Co.
Notes Payable -
1,500.00
1,500.00
1,500.00
* 1,500.00
E. Britt
Notes Payable -
7,000.00
Walter Kendzie
Notes Payable -
7,000.00
7,000.00
7,000.00
Carl Morajko
7,000.00
Accounts Payable:
Brunswick Balke
24,819.70
15,418.32
** 9,132.50
* 3,512.50
(Alleys)
Brunswick Balke
588.00
*
Modernization
Brunswick Balke
773.55
*
Fall Dating
Brunswick Balke
** 446.48
*
Fall Dating
National Cash
1,489.20
589.20
*
Register
Contractors:
Queen City Glass
3,393.79
2,793.79
2,793.79
* 2,668.35
Co
Albert R.
200.00
200.00
200.00
* 200.00
Rumschik
Nelson Wright
1,159.05
1,159.05
1,159.05
* 1,159.05
Harold Rising
1,268.00
1,268.00
1,268.00
* 1,268.00
Lockport Linoleum
1,610.39
410.39
200.00
*
Vincent Lardner
1,000.00
1,000.00
1,000.00
*
Newfane Lumber
753.76
556.85
*
Higgins & Wright
Walter Bobzim
Ulrich Sign Co
780.00
680.00
231.50
*
W. N. Y. Collum
1,100.00
1,100.00
Acoustical Co
McGonigle &
110.00
*
Hilger
Reserve for
Depreciation
17 Richmond Ave
7,694.68
8,825.71
9,956.74
10,688.37
11,399.34
13 W. Main St
343.70
2,623.23
10,503.82
18,440.22
26,544.05
Total Liabilities
$ 13,552.95
$127,557.33
$118,100.73
$112,539.77
$107,371.65
***
*138 * Stipulated. ** Total due to Brunswick Balke at 12/31/53. Now stipulated to be $9,558.98. *** Additional Note Payable at Kneeland Townsend Conceded Outstanding at Dec. 31, 1952, 1953 and 1954 - or, $1,510.93. 851 SCHEDULE D
Joseph & Sophie
Kendzie
Depreciation
Cost or
Reserve
Reserve -
17 Richmond
Adjusted
Useful
Prior to
Ave.
Years 1947-1954
Acquired
Basis
Life
1947
1947
1948
Inclusive
Brick Building
1939
$ 8,000.00
25 yrs.
$1,280.00
$1,440.00
$1,600.00
(1)
(1/2 Business)
Bar and Kitchen
1939
4,000.00
10 yrs.
1,600.00
2,000.00
2,400.00
Equipment
Improvements
1943
1,200.00
25 yrs.
192.00
211.43
230.86
(2)
(1/2 Business)
Bar
1944
394.00
10 yrs.
98.56
137.96
177.36
Building
1/1/47
25,610.06
25 yrs.
512.20
1,024.40
Addition (3)
(1/2 Business)
Total Reserve
$3,170.56
$4,301.59
$5,432.62
SCHEDULE D
Joseph & Sophie
Kendzie
Depreciation
Reserve -
17 Richmond
Ave.
Years 1947-1954
1949
1950
1951
1952
1953
1954
Inclusive
Brick Building
$1,760.00
$1,920.00
$2,080.00
$2,240.00
$ 2,400.00
$ 2,560.00
(1)
(1/2 Business)
Bar and Kitchen
2,800.00
3,200.00
3,600.00
4,000.00
4,000.00
4,000.00
Equipment
Improvements
250.29
269.72
289.15
308.58
328.01
347.74
(2)
(1/2 Business)
Bar
216.76
256.16
295.56
334.96
374.96
394.00
Building
1,536.60
2,048.80
2,561.00
3,073.20
3,585.40
4,097.60
Addition (3)
(1/2 Business)
Total Reserve
$6,563.65
$7,694.68
$8,825.71
$9,956.74
$10,688.37
$11,399.34
*139 (1) Adjusted to 1/2 Business 1947-1953. (2) Adjusted to 1/2 Business 1947-1954. (3) Not on Original Return - 1/2 Business. Depreciation
as Taken on
Return and
Adjusted
(1) Building
Bar & Equipment (1939)
Bar - 1944
(1939)
Per Return
Allowed
Per Return
Allowed
Per Return
1947
$320.00
$160.00
$400.00
$400.00
$39.40
1948
320.00
160.00
400.00
400.00
39.40
1949
320.00
160.00
400.00
400.00
39.40
1950
320.00
160.00
400.00
400.00
39.40
1951
320.00
160.00
400.00
400.00
39.40
1952
320.00
160.00
400.00
400.00
39.40
1953
320.00
160.00
39.40
1954
160.00
160.00
19.64
(2) Improvements (1943)
(3) Addition (1947) ** Per
Allowed
Per Return
Allowed
Return
Allowed
1947
$39.40
$48.00
* $19.43
** $256.10
1948
39.40
48.00
* 19.43
** 256.10
1949
39.40
48.00
* 19.43
** 256.10
1950
39.40
48.00
* 19.43
** 256.10
1951
39.40
48.00
* 19.43
** 256.10
1952
39.40
48.00
* 19.43
** 256.10
1953
39.40
48.00
* 19.43
** 256.10
1954
19.64
24.00
* 19.43
** 256.10
* Respondent made a mathematical error in calculating depreciation on the improvements made in 1943. The correct amount of annual depreciation allowable for an improvement valued at $1,200 with a 25-year life, used one-half for business, is $24, not the $19.43 amount which is used. ** An inconsistency exists between the depreciation which respondent allowed petitioners on the 1947 improvements and the supporting detail explaining the allowance. The correct amount of yearly depreciation on improvements costing $25,610.06, having a 25-year life, and used one-half for business is $512.20. This is the amount which respondent allowed. The supporting detail under (3), supra, indicates that respondent is only allowing $256.10 per year. To be consistent and accurate, the figures under (3), supra, should be $512.20 for each year - 1947 through 1954.
*140 852 SCHEDULE E Joseph & Sophie Kendzie
Depreciation Reserves - 130
W. Main St. Years 1947 -
1954 Inclusive
LIFE
DATE
1950
1954
(Yrs.)
Acq.
Cost
Depr.
Buick Building
40 yrs.
3/1/50
16500.00
343.70
Remodeling & Addition
40 yrs.
10/1/51
131500.00
Bowling Alleys
15 yrs.
10/1/51
40000.00
Bowling Equipment
5 yrs.
10/1/53
1116.20
Cash Register
10 yrs.
10/1/51
* 1639.20
Restaurant Fixtures
10 yrs.
10/1/51
13500.00
Totals
204255.40
343.70
Joseph & Sophie Kendzie
Depreciation Reserves - 130
W. Main St. Years 1947 -
1954 Inclusive
1951
Res.
Depr.
Res.
Depr.
Buick Building
343.70
412.50
756.20
412.50
Remodeling & Addition
821.88
821.88
3287.50
Bowling Alleys
666.67
666.67
2666.67
Bowling Equipment
Cash Register
40.98
40.98
163.92
Restaurant Fixtures
337.50
337.50
1350.00
Totals
343.70
2279.53
2623.23
7880.59
Joseph & Sophie Kendzie
Depreciation Reserves - 130
W. Main St. Years 1947 -
1954 Inclusive
1952
1953
Res.
Depr.
Res.
Depr.
Res.
Buick Building
1168.70
412.50
1581.20
412.50
1993.70
Remodeling & Addition
4109.38
3287.50
7396.88
3287.50
10684.38
Bowling Alleys
3333.34
2666.67
6000.01
2666.67
8666.68
Bowling Equipment
55.81
55.81
223.24
279.05
Cash Register
204.90
163.92
368.82
163.92
532.74
Restaurant Fixtures
1687.50
1350.00
3037.50
1350.00
4387.50
Totals
10503.82
7936.40
18440.22
8103.83
26544.05
*141 * Shown as 1500.00 on Returns and on Assets Schedule (Schedule B). 853 SCHEDULE F (Net Worth Adjustments) Joseph & Sophie Kendzie Net Worth
Adjustments Years 1947-1954
Inclusive
1947
1948
1949
1950
Personal living expenses
4000.00
4000.00
4000.00
4000.00
(Estimated)
(1) Extraordinary Mortgage Life
* 1566.75
Insurance Premiums
Total Additions
4000.00
4000.00
4000.00
5566.75
Less: Deductions
(2) Non-taxable portion
250.00
1750.00
Net Adjustments
3750.00
4000.00
4000.00
3816.75
Joseph & Sophie Kendzie Net Worth
Adjustments Years 1947-1954
Inclusive
1951
1952
1953
1954
Personal living expenses
4000.00
4000.00
4000.00
4000.00
(Estimated)
(1) Extraordinary Mortgage Life
* 1566.75
Insurance Premiums
Total Additions
5566.75
4000.00
4000.00
4000.00
Less: Deductions
(2) Non-taxable portion
1000.00
Net Adjustments
4566.75
4000.00
4000.00
4000.00
(1) Paid to Connecticut General Life Insurance Co. to protect mortgage by Marine Trust Co. on Main St. Building (2) Sale of real property at 214 Park Ave., Lockport, N. Y. (1947) Sale of goodwill at 17 Richmond Ave. *142 , Lockport, N. Y. (1950) Sale of real property at South St., Lockport, N. Y. (1951) Gain or
loss from sale
of Capital
Assets
Date
Date
Sales
Cost
Gain
Gain
Gain
Acquired
Sold
Price
1947
1950
1951
Real Estate,
10/11/46
5/2/47
6500.00
6000.00
500.00
214 Park Ave.
*
Business
1950
3500.00
3500.00
(Goodwill), 17
Richmond *
81 South St. *
10/ 1/46
8/8/51
7000.00
5000.00
2000.00
Gain on Sale
500.00
3500.00
2000.00
50%
250.00
1750.00
1000.00
Non-Taxable
* Stipulated 854 Opinion Since the statute of limitations applies to all years in issue, no tax may be assessed unless petitioners filed fraudulent returns.[2] We therefore first determine if respondent has met his burden of proof to show fraud. The burden of proof on this issue is on respondent to show by clear and convincing evidence that petitioners knowingly understated a portion of their taxable income with the intent, at the time their return was filed, to evade the tax in each of the years in issue. Estate of William Kahr, 48 T.C. 929 (1967), on appeal (C.A. 2, July 3, 1968) and (C. *143 A. 5 July 3, 1968); Arlette Coat Co., 14 T.C. 751 (1950). Our discussion of the issue will relate to the taxable years in issue in three groups - 1947 through 1949, 1950 through 1951, and 1952 through 1954. 1947 through 1949 Under the holding of Holland v. United States, 348 U.S. 121 (1954), *144 respondent, in order to prove fraud, must first show that there is an unexplained increase in the taxpayers' net worth over a period of years which is greater than that reflected on his income tax returns. To do this, he must establish the taxpayers' opening net worth with reasonable certainty in order to have a starting point from which to measure the increase. We have grave doubts as to whether respondent has established petitioners' opening net worth insofar as cash on hand at December 31, 1946, the beginning of the period in issue, is concerned. According to respondent's schedules reproduced in the findings of fact, petitioners had cash on hand of $22,000 on December 31, 1945. This amount was determined by him after he examined petitioners' testimony before the State Liquor Authority in 1951. At the time the testimony was presented petitioners were attempting to get a liquor license for the restaurant operated at 11-13-15 Main Street. The purpose of petitioners' testimony at that time was to show the source of their assets. Apparently the cash came from the following sources: Proceeds from the sale of Joseph's bakery route prior to going
$ 1,500
into the restaurant business
Money saved from the bakery route
1,500
Cash saved by Sophie prior to her mar- riage in 1935
6,000
Wedding gifts
5,000
Gift or loan from Sophie's father, Andrew Figura
8,000
$22,000
*145 For reasons unexplained by respondent at the trial or on brief, respondent reduced petitioners' cash on hand to $2,404.04 on December 31, 1946. However, if he had credited petitioners with $22,000 as he did on December 31, 1945, the unexplained net worth increase which respondent determined in his net worth schedules for the years 1947 through 1949 would be reduced to $10,200 (rounded). Respondent's schedules indicate that for the years 1947 through 1949 petitioners had unexplained net worth increases of approximately $29,800. This includes amounts representing living expenses of $4,000 annually for the three-year period. In the findings of fact we have described the modest living habits of petitioners in the small community in which they resided and have affirmatively found personal expenditures of $1,650 annually, the amount for which petitioners contend. After adjusting respondent's determination further for this amount, the unexplained increase determined by him is reduced to approximately $3,150. If respondent had credited petitioners with $22,000 cash on hand at December 31, 1946, as he did on December 31, 1945, the unexplained increase in petitioners' net worth would only *146 amount to about $1,000 per year, assuming that the cash on hand was exhausted over that three-year period. In addition there would have been more than sufficient cash on hand to have been expended for the asserted increase in net worth items for any one of the years 1947, 1948 or 1949. 855 The Holland case, supra, holds that respondent must establish with reasonable certainty the value of each of petitioners' assets at the beginning of the net worth period. In the instant case the crucial date is December 31, 1946, as it is from that point forward that we are comparing petitioners' net worth increase with their reported income. Though respondent's determination of $22,000 cash on hand at December 31, 1945, seems reasonable enough, respondent cannot use this figure to support his determination of $2,404.04 cash on hand at December 31, 1946. Respondent must establish the later amount by independent evidence. In the instant case respondent has introduced virtually no evidence to substantiate the $2,404.04 amount. The skimpy evidence before us actually indicates that cash on hand was substantially greater than his determination. Respondent's schedules indicate that petitioners' *147 net worth increased approximately $5,000 in 1946, a year not in issue before this Court. This small amount is entirely inconsistent with the asserted net worth increases of over $8,000 determined for the years 1947 and 1948, $17,000 in 1949 and over $29,000 in 1950, all of which increases respondent has determined as solely attributable to petitioners' restaurant business. If we are expected to accept respondent's determinations of petitioners' earnings for the restaurant for years after 1946, it is only logical for us to believe that comparable amounts were earned in 1946 and prior years. The evidence presented was to the effect that the operation of the restaurant was substantially unchanged during the entire period of its operation, and we have so found. Without adjusting any of the other figures shown in respondent's schedule of assets at December 31, 1946, it is not unreasonable to assume, and we find and hold, that there was sufficient cash on hand at December 31, 1946, to provide for the increase in other assets determined for the years 1947, 1948 and 1949. Under these circumstances we cannot find that there was unreported income in either 1947, 1948 or 1949. Respondent's *148 position is that funds for petitioners' increase in net worth must have come from income from the Richmond Street business. However, in each year petitioners could have expended cash on hand for the assets. As we said in W. A. Shaw, 27 T.C. 561 (1956), affd. 252 F. 2d 681 (C.A. 6, 1958), at 570: The increase in these assets may have occurred entirely in one year and the fraud might have been consummated solely in that year. In such a situation, there is no justification for spreading the deficiencies and fraud penalties over a period of years. One of the fundamentals of our income tax system is the annual accounting concept and, although the net worth method of determing an individual's taxable income may result in some slight deviation from this because of the approximations inherent in a net worth computation, there is no authority in the Code for a complete disregard of the principle that each year is a separate taxable unit. Where the issue is fraud, we cannot assume that such fraud occurred in each of the years in issue rather than solely in one. See also In re Parr, 205 F. Supp. 492, 496 (S.D. Tex. 1962), and Jacobs v. United States, 126 F. Supp. 154 (Ct. Cl. 1954). *149 Additionally, even if we were to assume that petitioners' cash on hand was not sufficient to account for their increase in assets over the three-year period, or was not expended in a particular year, then it might follow that there was income from another source which was unreported. But in the absence of evidence to show the year or years in which a possible understatement took place, we cannot arbitrarily allocate such assumed understatement to any one year. Respondent must show that income was received and unreported in each year in which he seeks the fraud penalty. Cash on hand could have eliminated any proposed understatement of income for 1947, 1948, or 1949. We therefore hold that respondent has failed to show an understatement of income and has consequently failed to show fraud for any of these years. [3]
1950-1951 Unlike the years 1947 through 1949, respondent has established his determined cash on hand figure of $1,000 for 1950 and thereafter. The evidence is clear that beginning *150 in 1950 petitioners were borrowing money from banks and relatives in order to finance higher than expected costs of the bowling alley-restaurant on Main Street 856 which was built during 1950 and 1951. Subsequently they were attempting to pay off the liabilities incurred. It is unlikely under these circumstances that petitioners would have maintained a substantial amount of cash on hand, once the Main Street building was begun. The determined understatements of taxable income for 1950 and 1951 are approximately $27,500 for 1950 and $23,500 for 1951. Petitioners contend that these determined understatements have no basis in fact because respondent's net worth schedules overstate the amount spent on the Main Street building and do not reflect cash gifts received from relatives - which gifts were used in completing the Main Street structure. In addition, petitioners claim that they are entitled to a $16,500 demolition loss deduction for the value of the theater building which had to be torn down completely in order to build the bowling alley-restaurant. They also claim that they are entitled to other smaller deductions. Bearing in mind that respondent's burden is to show by *151 clear and convincing evidence that petitioners deliberately understated their taxable income, we find that the evidence presented for 1950 and 1951 as a whole falls short. The evidence presented to support respondent's determination that petitioners expended over $200,000 on the Main Street building is relatively meager. Petitioners' income tax returns do show a basis for depreciation identical to the total amount determined by respondent to have been expended during the period 1950 through 1952. Respondent, however, has juggled the years in which the expenditures were shown to have been made in determining petitioners' yearly increase in net worth. His schedule of assets shows that petitioners spent $16,850 and $13,500 more than they showed on their returns for the years 1950 and 1952 respectively. Concomitantly his schedule of assets for 1951 shows expenditures which are $30,350 less than that shown by petitioners' returns. The only evidence, other than the returns, supporting respondent's figures was the testimony of Donald Brownell, a special agent for the Internal Revenue Service, who testified that he had verified the amounts determined expended on the Main Street building *152 after he had analyzed canceled checks and contacted suppliers and contractors. He gave no detail as to his procedures. Neither were the canceled checks or any other type of documentary evidence introduced into the record, nor were any suppliers or contractors called as witnesses. The persuasiveness of this evidence is less than overwhelming. The figures on the income tax returns were derived from the records which Joseph made available to his accountants. Yet respondent contends that these same records were entirely inadequate, and their supposed inadequacy is being used as a basis for his using the net worth method and determining the fraud penalty. Some of the records were in the courtroom at trial, including canceled checks for 1950 and 1951, yet they were not introduced into evidence. In the absence of these records being introduced into evidence we cannot give as much weight to petitioners' depreciation tables on their returns as we otherwise would. The testimony of Brownell was also far from convincing because of its lack of specificity. In addition we have doubts as to whether his investigation was properly thorough and accurate. Brownell testified that he cooperated in *153 preparing the schedules showing respondent's determination of net worth. Internal inconsistencies noted by us on these schedules are of a type which cause us to question whether the individuals who prepared them used a high degree of thoroughness and care. Brownell's testimony must be weighed in the light of his work product. Petitioners contend that they spent only $160,000 on the Main Street building. Joseph testified that the total cost was $160,000 but no documentary supporting evidence was introduced. Collateral support for this figure is found however, in the case of Kendzie v. O'Connell, 283 App. Div. 256 (1954), 127 N.Y.S. 2d 380, where the court reviewing petitioners' liquor license application found that the building cost $166,394.06, and observed that petitioners had made full disclosure of all their records. Without further evidence as to what records were in court for that hearing, or the testimony presented, we cannot find that only $166,000 was expended. However, in the instant case, without having the books and records before us or the information contained therein, we also find it difficult to sustain respondent's determination that over $200,000 was *154 expended. 857 We also have a problem in regard to the amounts expended on the Main Street property which are attributable to gifts. Petitioners claim that during 1950 and 1951 both Joseph's mother and Sophie's father helped them out financially. They testified that each made, inter alia, $12,000 cash gifts which could have been given during these years. Petitioners introduced no physical evidence to show that these gifts took place, but did testify as to the ability of their respective parents to make the gifts. Bernice Homiazczak, Joseph's mother, was described as a woman who had married twice, inherited some money upon the death of her first husband along with $1,200 in life insurance proceeds and who also inherited an additional sum of money upon the death of her second husband. Andrew Figura, Sophie's father, was described as a "great saver" who hoarded cash in an iron box and who was always willing to help petitioners out in times of need because they took care of him in his old age. His background is set out in the findings of fact. Though respondent was aware prior to trial that petitioners would contend that funds for the Main Street building came from their parents, *155 he presented absolutely no evidence in regard to their inability to make such gifts. However, he apparently concedes that some gifts were made as he did credit petitioners with gifts of $4,000 in 1949 and $4,000 in 1950. Under the decision in Holland v. United States, supra, at 135-136, the failure of respondent to present such evidence must weight heavily against him. As was stated in that case: When the Government rests its case solely on the approximations and circumstantial inferences of a net worth computation, the cogency of its proof depends upon its effective negation of reasonable explanations by the taxpayer inconsistent with guilt. Such refutation might fail when the Government does not track down relevant leads furnished by the taxpayer - leads reasonably susceptible of being checked, which, if true, would establish the taxpayer's innocence. When the Government fails to show an investigation into the validity of such leads, the trial judge may consider them as true and the Government's case insufficient to go to the jury. * * * Cf. Fairchild v. United States, 240 F. 2d 944 (C.A. 5, 1957), where the court said (p. 948): Finally, what was *156 said in Holland v. United States, supra, a criminal case, is pertinent here because the same limitations inhere in the net worth method wherever it is sought to be applied. Respondent had the obligation to investigate the financial circumstances of Andrew Figura and Bernice Homiazczak in order to determine if such gifts as petitioners claim could have been made by them. One indication of their ability to make such gifts would be their respective income tax returns. However, respondent presented no evidence indicating that he had done anything and as a result must bear the consequence for which the Holland case provides. The Holland case, along with United States v. Massei, 355 U.S. 595 (1958), also provides that where the net worth method is used the respondent must prove there is a likely source of taxable income or else negate the existence of all nontaxable sources of income which are suggested by the petitioners. Cf. Gatling v. Commissioner, 286 F. 2d 139 (C.A. 4, 1961), affirming T.C. Memo. 1959-224; Ferris v. Commissioner, 317 F. 2d 333 (C.A. 2, 1963), affirming T.C. Memo. 1962-94. Respondent *157 contends that he has shown a likely source of income for 1950 in the Richmond Street restaurant operation, and for 1951 in the Main Street bowling alleyrestaurant operation to support an adjusted gross income of $29,324.13 in 1950, and $26,715.58 in 1951. We find it impossible for either operation to have earned anything like those amounts in those years. The Richmond operation was a two-man restaurant serving inexpensive food and liquor. During 1950 it was run by petitioners for a maximum of only three months, at which time it was sold for $3,500. On an annual basis, respondent's $29,000 figure indicates gross income of over $116,000, almost seven times greater than that determined for the previous year, and more than nine times greater than that determined for the earnings for 1947 and 1948. It is also the same restaurant which respondent found earning only about $5,000 in 1946, though the evidence indicates, and we have found, that no apparent change in operations took place from 1946 through March 1950. The $29,000 figure for 1950 is thus entirely unbelievable and cannot be relied upon as an accurate estimate of 858 petitioners earnings for the business for that year. *158 Respondent's determination of over $26,700 in earnings for the bowling alley-restaurant combination in 1951 is equally fragile. The bowling alley-restaurant combination was not opened until October of that year, yet $26,700 is about twice as much as respondent determined was earned in 1952, or 1954, and almost three times his determination for 1953, all of which were full year operations. The evidence presented supports a finding that business improved during these years. Respondent's schedule would require us to find just the opposite, and this we cannot do. Along with our other doubts concerning respondent's proof, we suspect that respondent has assumed that because he first discovered assets in 1950 and 1951, the income giving rise to those assets was earned in those years. Respondent has not attempted to show, or even hinted at, any source of income outside of the above-mentioned operations and it is clear that in 1950 and 1951 neither would have produced the net worth increase which respondent determined. If petitioner did have the net worth determined for 1950 and 1951, a much larger portion of the amount must have been received prior to 1950 and/or from the nontaxable sources *159 suggested by petitioners. Without a reasonable explanation for the discrepancies between respondent's figures and the realities of the situation as it existed in 1950 and 1951, we cannot automatically equate amounts spent with income earned. [4]
Though petitioners' evidence was not conclusive that there was no understatement, their contention that respondent overstated the cost of the Main Street assets and understated the gifts which they received to help pay for the Main Street property has more substantiation than respondent's totally unrealistic determinations. *160 Under these circumstances we find that respondent has failed to show by clear and convincing evidence that there was an understatement of income for 1950 and 1951 and thus find that no fraud has been shown. Consequently we need not consider the validity of the various deductions which petitioners have contended are allowable. 1952-1954 For these years the evidence indicates that petitioners had taxable income which was not reported on their income tax returns. Petitioners contend that respondent overstated their personal expenses and did not give them credit for various liabilities. However, even if we find for petitioners on all of these items, there are still unexplained discrepancies between reported income and stipulated net worth increases, exclusive of depreciation, of (rounded) $7,500 in 1952, $1,000 in 1953, and $2,200 in 1954. These amounts are to be compared with reported income amounts of approximately $2,300 in 1952, $4,600 in 1953, and $4,900 in 1954. Petitioners in their pleadings imply that gifts or loans from relatives not allowed for by respondent were received in these years. However, the evidence presented indicates that the gifts were given prior to the *161 completion of the Main Street property in 1951 to help pay for its cost. There is little or no evidence indicating that petitioners needed outside help once the building was completed, and we find that at least a portion of the net worth increase for each of these years was attributable to the bowling alleyrestaurant operation. Petitioners claim larger depreciation deductions than those allowed by respondent which would, if proved, eliminate the deficiency determined for 1953 and reduce substantially the deficiencies for 1952 and 1954. However, whether or not they are entitled to increased depreciation deductions, these items do not alter the fact that there was income earned which was not reported. [5]
*162 859 The question remains as to whether respondent has made a prima facie case of fraud for the years 1952 through 1954. Though the understatements of income are substantial in comparison to income reported for each year, the mere understatement of income over a period of years is not sufficient in and of itself to show fraud by clear and convincing evidence. There must be something more in addition to the understatements. As we pointed out in John Marinzulich, 31 T.C. 487 (1958) at 490: Respondent emphasizes the consistent understatements of income by the petitioners on their income tax returns. It is not enough, however, to establish fraud merely by showing understatements of income. Holland v. United States 348 U.S. 121; Blackwell v. United States, 244 F. 2d 423; James Nicholson, 32 B.T.A. 977, 989, affd. 90 F. 2d 978. Repeated understatements of income, of course, are evidence from which fraud may be inferred, Nathan Bilsky, 31 T.C. 35, but there must be something more in order to meet the "clear and convincing" test, especially in those cases where, as here, the understatements appear by comparing *163 the income returned with income computed by the net worth method. And compare Woodham v. Commissioner 256 F. 2d 201, 203-204 (C.A. 5, 1958), affirming a Memorandum Opinion of this Court. [6]
In the instant case we have searched the record, but have not found any other badges of fraud to support the inference of fraud which the understatements for 1952 through 1954 have created. We have noted in the findings of fact petitioners' method of record keeping for the Main Street and Richmond properties. It was hardly *164 a model of efficient bookkeeping, yet it certainly was not inconsistent with an honest system of recording transactions which a person with little formal education might maintain. A certified public accountant testified that the records were sufficient to provide complete information of the business' operations, and on the basis of the entire record we have come to the same conclusion. We have also noted that when analyzing petitioners' records the internal revenue agents found no evidence of false entries or erasures on the records, nor did they find any "duplicate" books or records. There was also no evidence that any assets or bank accounts had been concealed. The fact that Joseph paid all or nearly all of his bills by check further negates the existence of any attempt to hide income. There was testimony that some of the records were missing when the agents came to investigate the Kendzies. However, Joseph testified that the records were handled by numerous individuals, including his accountants, his attorneys and individuals, connected with the State Liquor Authority. The most important record was Joseph's single entry ledger book whose purpose was to record income for the *165 bowling alleyrestaurant operation and that book was turned over to the internal revenue agents. If there was any indication that that book did not record all income received, respondent should have presented evidence of such fact and might thus have established a prima facie case of fraud. See Holland v. United States, supra.The only evidence in this regard, however, was the testimony of Brownell that the books, the returns, and the canceled checks were inconsistent, but neither the nature nor the amount thereof was made clear. For all we know, the single entry ledger did in fact reflect all income received. The only witness respondent called other than Brownell was Nelson Thurston, manager of the bowling alley during the years in question. He kept records of each line bowled and made out payroll reports. He testified that at no time was he told to hide the existence of income nor was he aware of any such attempt. It is further significant that accountants prepared all of petitioners' returns from petitioners' records and that petitioners have little knowledge of bookkeeping or accounting methods other than the crude system which they used. Without knowing more *166 860 about the records, it is impossible to determine if the returns reflected the intent of petitioners or were negligently prepared by their accountants. There is no evidence of fraud on the part of the accountants, and without any real indication as to what was wrong with petitioners' records, which information may have been in respondent's possession, we cannot find that income was deliberately concealed by petitioners. In light of the complete absence of any definite signs of fraud other than the understatements of income, we find that respondent has established only a suspicion that petitioners deliberately understated their income. But a suspicion is not proof of fraud. L. Glenn Switzer, 20 T.C. 759, 765 (1953); John Marinzulich, supra. We have not found fraud to exist for any of the years in issue. It follows that sections 275 of the 1939 Code and 6501 of the 1954 Code bar respondent from assessing petitioners for taxes and additions to tax for the years in issue. Decision will be entered for the petitioners. Footnotes
1. Though the returns for 1947 and 1950 are in the name of Joseph Kendzie alone and are signed only by him, the parties have stipulated that they were in fact the joint returns of Joseph and Sophie, and we so find. It is stipulated that the returns for the years 1947 and 1950 show Joseph's and Sophie's reported income, and that the returns filed were their returns. Depreciation on property, which was stipulated as belonging to both petitioners, is reported in the same manner and in the same amounts on those returns as on the returns signed by Joseph and Sophie as joint returns. The returns themselves indicate that no separate return was being made by Sophie and further indicate a $600 exemption for Sophie as a wife filling a joint return.↩
1. Stipulated.↩
1. Stipulated.↩
2. Internal Revenue Code of 1954: SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. (a) General Rule. - Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) or, if the tax is payable by stamp, within 3 years after such tax became due, and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period. * * * (c) Exceptions. - (1) False Return. - In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time. (Substantially, similar provisions appear in sections 275 and 276 of the 1939 Code.)↩
3. See and compare Thomas W. Banks, T.C. Memo. 1961-237, modified on other grounds 322 F. 2d 530 (C.A. 8, 1963): Harvey Brodsky, T.C. Memo. 1962-105↩.
4. See and compare Harold E. Delaney, T.C. Memo. 1958-185: The second erro ris one under which the agents of respondent appear to have labored. Their position is that the increase in net worth discovered in a given year can be taken as demonstrating that the increase occurred in that year and the income taxed accordingly in the face not only of a lack of any showing of a likely source of the income, see United States v. Massei, 355 U.S. 595↩, but even of admissions that the presumptive occasion for the receipt of income was events occurring in prior taxable periods. [Footnote omitted.]
5. We do not decide the correct amount of depreciation, because of our finding infra that respondent failed to establish a prima facie case of fraud. However, we note that in the case of deductions, as opposed to unreported income, petitioners must establish the deductions by substantial evidence before respondent is required to go forward with evidence to negate the existence of the deductions in order to show fraud. United States v. Bender, 218 F. 2d 869, 871-872, (C.A. 7, 1955); cf. Small v. United States, 255 F. 2d 604 (C.A. 1, 1958); United States v. Procario, 356 F. 2d 614↩ (C.A. 2, 1966).
6. See also Camden Wall Paper Co. T.C. Memo. 1967-52, where we said: In Toledano v. Commissioner, 362 F. 2d 243 (C.A. 5, 1966), affirming in part, reversing in part, and remanding a Memorandum Opinion of this Court, * * * the Court of Appeals for the Fifth Circuit said: The understatements of interest and dividend income were substantial and consistent. Being substantial and consistent these are evidence of fraud, but such evidence, without more is not enough to carry the Commissioner's burden to establish fraud by clear and convincing evidence. Merritt v. Commissioner, 5th Cir. 1962, 301 F. 2d 484↩. [Emphasis supplied.]